COWDEN ET AL., RESPONDENTS, *v.* CRIPPEN, APPELLANT.

(No. 7,461.)

(Submitted December 6, 1935. Decided January 7, 1936.)

[53 Pac. (2d) 98.]

188

*Messrs. Speer & Hoffman* and *Mr. W. B. Leavitt,* for Appellant, submitted a brief; *Mr. Harvey B. Hoffman* argued the cause orally.

190

192

*Mr. George W. Farr* and *Mr. Carl L. Brattin,* for Respondents, submitted a brief; *Mr. Farr* argued the cause orally.

194

MR. JUSTICE STEWART delivered the opinion of the court.

Viola Cowden, Loretta Cowden, Lorna Crawford and Ruth Cowden, heirs at law of L. E. Cowden, deceased, obtained a judgment in the district court of Custer county against Clarence Crippen. The action was prosecuted under the so-called "Guest Statute" of the state of Montana (Chap. 195, Laws of 1931), which reads as follows:

"Section 1. The owner or operator of a motor vehicle shall not be liable for any damages or injuries to any passenger or person riding in said motor vehicle as a guest or by invitation and not for hire, nor for any damages to such passenger's or person's parent or guardian, unless damage or injury is caused directly and proximately by the grossly negligent and reckless operation by him of such motor vehicle.

"Section 2. Any person riding in a motor vehicle as a guest
or by invitation and not for hire, assumes as between owner and
guest the ordinary negligence of the owner or operator of such
motor vehicle.

"Section 3. The ordinary negligence of the owner or operator
of a motor vehicle as between owner and guest is imputed to any
person riding in such vehicle as a guest or by invitation and not
for hire."

It appears that the deceased Cowden, who was a farmer liv-
ing near Sidney, Richland county, was desirous of attending
a farmers' meeting at or near Miles City on December 4, 1933.
By previous arrangement W. L. Bell, Godfried Miller, Daniel
La Bonte and L. E. Cowden arranged to ride to Miles City
with Crippen as nonpaying passengers. All were desirous of
attending a turkey grading school which was to be held by the
United States Range Livestock Marketing Association. The
school was scheduled to open at about 8 o'clock in the morning.
At a very early hour Crippen picked up his passengers. Bell,
who resided in Sidney, rode in the front seat with Crippen;
the others were picked up at intervals between Sidney and Glen-
dive. At Glendive the party stopped for breakfast, and later
proceeded on towards Miles City.

The road from Glendive through Terry and to a point about
twenty miles east of Miles City was a Federal-Aid highway,
graded and graveled but not oiled. From this last-named point
on to Miles City the road was what was known as oil-finished
or surfaced. Crippen was an experienced driver, having owned
eight automobiles and having driven several hundred thousand
miles over a period of years. The car he was driving on this
occasion was a 1933 Studebaker Regal sedan equipped with
heavy, nonskid, six-ply tires. He had owned the car for about
five months and had driven it about 2,500 miles. It was in
good condition, and, according to all of the evidence, it ran
normally, and he was a good driver. No complaint was made
of his driving, although he made an average speed of from 45
to 50 and perhaps 60 miles an hour.

All the witnesses agreed that the speed was fairly uniform, and that there was no slipping or skidding or anything of an unusual character connected with the trip until they reached the point of the accident, which was 2½ miles east of Miles City, and about 18 or 20 miles west of the beginning of the oil-surfaced road. The only change observed by the driver or the passengers between the oiled road and the graveled was that the car ran more smoothly, but about the same rate of speed was maintained.

At a point about two or three miles from the place of the accident a high school boy by the name of Tomten, driving a Chevrolet car, came into the road from the north and just ahead of the Crippen car. There is some difference of opinion as to the speed maintained by Tomten as he came onto the highway. Crippen, however, slowed his car down, and Tomten straightened out on the highway on the right side of the road. Immediately after that Crippen passed the Tomten car and moved over to the right side of the road himself, and proceeded at about the same rate of speed, that is, somewhere between 45 and 63 miles an hour.

It appears that Tomten decided to pass the Crippen car and proceeded to speed up. He gave notice of his desire by honking his horn. All of the passengers agree that he so signified his intention. Crippen said that he heard the signal, applied his brakes a few times with the purpose of slowing down, and that he moved farther toward the right side of the road to make way for the Chevrolet car. At this point the oiled surface of the road was 20 feet wide, with a graveled shoulder or extension of about 3 feet on each side thereof. Crippen's car moved over to the extreme right of the oiled surface. According to the witnesses who examined the tracks after the accident, the right wheels of the Crippen car moved along the edge of the oiled surface, part of the time on the gravel and part of the time on the oiled surface, the left wheels being toward the middle of the road.

There was but one witness to the accident, in addition to the occupants of the car; that was one Fred Hansen, a farmer who lived some 60 rods from the road. He was in his yard and observed the two cars moving at what he denominated a high rate of speed, 50 to 60 miles an hour. He said he thought there would be an accident and he watched to see, and finally observed the occurrence. The Tomten car pulled in toward the Crippen car and a contact was made which resulted in the accident. Cowden was either instantly killed or so badly injured that he died shortly thereafter. The other occupants of the car were taken to Miles City and hospitalized.

In due time this suit was instituted. The particular acts of negligence charged against Crippen were: (a) That he failed to keep a proper lookout, particularly for vehicles attempting to pass; (b) that he was running at excessive speed, to-wit, about 50 miles an hour; and (c) that he failed to keep his car under control so that he could apply the brakes or bring it to a stop on the traveled surface of the roadway or highway, without the car wheel skidding on or off the highway. The important allegations of the complaint are substantially as follows: That the highway upon which the party was traveling was a public highway known as Federal-Aid Highway No. 10; that for approximately 20 miles eastward from Miles City it was oiled, hard and smooth; that the night before the accident there had been a fall of rain, snow and sleet and a below-freezing temperature; that the surface of the highway was covered with ice, so that it was rendered dangerous and unsafe for travel; that the driver was required to keep and maintain a lookout and watch for other vehicles attempting to pass, and to operate his automobile at a slow rate of speed on account of the icy condition, and so as to keep the car under complete control; that, as the car proceeded over the highway, one Ernest Tomten, driving a Chevrolet car, attempted to pass Crippen's car, and that the two cars came together and collided by reason of the careless, negligent and reckless manner in which Crippen was driving his car; that as a result of the collision the

Crippen car slipped and skidded off the traveled portion of the highway, turned over several times, threw Cowden violently against the framework thereof, and injured him to such an extent that he died; and that the results were due to the concurrent wrongful acts of negligence of both Crippen and Tomten.

The answer denied the essential allegations of the complaint, but admitted the collision between the two cars. It alleged that the accident occurred by reason of the negligent and reckless driving of Tomten, who, it is alleged drove his car into the Crippen car and forced it from the road. Thereafter reply was filed, and the cause came to trial; julgment was entered for the plaintiffs and against the defendant Crippen, who appealed from the judgment.

As we have suggested, there was but one eye-witness, aside from the occupants of the cars. Tomten did not testify nor make any explanation of his actions. The witness Hansen was approximately 60 rods away. W. L. Bell sat in the front seat with the driver; he testified that he heard the horn of the Tomten car, and that Crippen applied his foot brake and had slowed down some when the Tomten car came up to the Studebaker. At the inquest he gave the speed of the Crippen car as 50 miles an hour at the time of the signal, and said that thereafter Crippen slowed down to about 40. At the trial he gave the speed of the Crippen car as 63 miles an hour and said that Crippen slowed down to 60. He said that the Tomten car came onto the road at about 50 miles an hour but slowed down to 20 or 25 after it got on the road. He detailed the incident of Crippen's passing the Tomten car, and said that when Tomten in turn tried to pass the Crippen car he moved alongside Crippen, and he thought that the wheel of the Tomten car caught on the bumper of the Crippen car; he was sure that there was some kind of contact between the two cars, causing the Crippen car to leave the road. He had not observed any ice or any slippery condition of the highway until after the

accident; immediately after the accident, when he got out he observed ice on the highway.

Miller, who was riding on the back seat of the Crippen car, told of the approach of the Tomten car, and said it looked to him as though Tomten "was headed for us." He testified at the trial that Crippen was driving 50 or 60 miles an hour at the time, but in a previous statement made shortly after the accident he had estimated the speed at around 40 miles. He did not observe any trouble or slippery condition on the oiled highway and had not noticed any skidding. He first observed the ice after the accident.

La Bonte, another back-seat passenger, estimated the speed of the Crippen car at 50 or 60 miles an hour. He also said that it looked for a time as though Tomten was going to "drive into us." He said that Crippen did not slacken his speed; he also stated that there was a contact or collision between the two cars. He had not noticed any ice on the road or any unfavorable driving conditions previous to the accident.

One Hooker, a witness for plaintiffs, testified that he drove over that highway at approximately the hour of the accident, and that its condition was icy and slick.

Adrian Lindsay, another witness for plaintiffs, drove over the road; he said that his tires were smooth, and he observed the icy condition of the road and was forced to drive near the edge where the wheels on one side would be on the graveled surface instead of the oiled surface. Other witnesses, including the sheriff and undersheriff, testified that there was ice on the road, but no one testified that the Crippen car had slipped or skidded by reason thereof prior to the accident.

Sheriff Taylor, of Custer county, reached the scene of the accident shortly after its occurrence. He made observations and measurements. He said that the highway was icy on the oiled part, and that there had been no skidding of the Crippen car for a distance of 200 feet before it went off the grade. He observed that the brakes had been applied once or twice, and that the left wheels, running on the oiled surface, had slipped for-

ward or straight ahead. He measured the width of the road as 20 feet on the oiled portion, and as 3 or 4 feet of gravel surface on each side. He said that the right wheels of the Crippen car had been running partly on the oiled surface and partly on the gravel, so that it indicated that Crippen was over as far to the right as he could get; that near the point where the Crippen car went off the grade for 20 or 30 feet the right wheels were on gravel directly off the oiled pavement; and that all skidding was straight ahead. He said there was no evidence of frozen gravel sufficient to interfere with the traction of the right wheels. He observed the tracks of the Tomten Chevrolet as they approached the tracks of the Studebaker. He said that at a distance of about 200 feet east of the place of accident the tracks of the two cars were from eight inches to a foot and a half apart; at some points they were not over 8 inches apart. He estimated the distance of the right-hand track of the Chevrolet car as being 9½ feet from the right side or edge of the oiled surface, so that it indicated that Tomten was over to the right of the middle of the road. He said that at the point where the Studebaker left the highway, the tracks veered off into the ditch at about a 45° angle, and that at no time was there any evidence of slipping sideways. Specifically he said, "Yes, it looked simply like the wheels turned into the ditch to the right."

Crippen himself testified that as he was proceeding along, after passing the Tomten car, he heard the horn indicating that there was a car behind desiring to pass; that after he heard this signal he applied his brakes and pulled over still farther to the right side of the road in order to let the car go by; and that then his right wheels were just off the pavement on the gravel. He said he did not observe any slipping or sliding or weaving of his car; that when he first saw the front end of the Chevrolet, it was just a little ahead of the back of his car; that he tightened his grip on his steering wheel and kept his car approximately straight ahead; that the Chevrolet hit his car at an angle and slid up until it hooked on something; that his car then turned off at an angle and started down the bank;

that he distinctly felt the impact when the Chevrolet hit his car; and that the reason his car went off the highway was that the other car came in from the side and hit him and took the front wheel off the ground so that it took the control of the car out of his hands and shoved it over the bank. He also testified that he could have held the road with safety on up to Miles City if it had not been for the collision.

There is no evidence in the record relative to any protest or suggestion from any one of the passengers as to Crippen's driving, or as to the rate of speed, or the manner of his handling his car. All admit that Crippen was a good driver and that he observed the law and rules of the road. None of the occupants of the car seemed to realize or apprehend that there was ice on the surface of the road or that the condition was unusual, extraordinary or dangerous; at least, if any of the passengers observed such conditions, they failed to make them known to the driver and did not detail such facts in any of the testimony or statements made before the trial or in the course of the testimony given at the trial.

In accordance with the provisions of the Automobile Guest Act, it was incumbent upon plaintiffs, before they were entitled to recover, to prove that Cowden's death was caused directly and proximately by Crippen's grossly negligent and reckless operation of his car (*Nangle* v. *Northern Pac. Ry. Co.*, 96 Mont. 512, 32 Pac. (2d) 11), either standing alone or in concurrence with wrongful acts on the part of Tomten. The court instructed the jury as to the provisions of the Guest Statute. "The proximate cause of an injury," the court said, "is that cause which in a natural and continuous sequence, unbroken by any new and independent cause, produces the injury, and without which it would not have occurred." (*McNair* v. *Berger*, 92 Mont. 441, 15 Pac. (2d) 834, 837.) The court further instructed the jury that "gross negligence is something more than ordinary negligence; it is the want of slight care." (*Nangle* v. *Northern Pac. Ry. Co.*, supra.) It further said that "if the deceased, L. E. Cowden, knew that the defendant Crippen was

driving his automobile at an excessive and dangerous rate of speed, and had the opportunity to insist that Crippen desist from operating his said automobile at such dangerous and excessive rate of speed, if any, and failed to do so, and sat by without protest and permitted himself to be driven at an excessive and dangerous rate of speed, and that by reason of such excessive and dangerous speed the defendant Crippen caused the said automobile to overturn and injure the deceased, then in that event you must find your verdict in favor of the defendant''; that a person in the position of Cowden while riding in Crippen's car ''is presumed to see that which he could see by looking and he will not be permitted to say that he did not see or know what he must have seen or known had he looked''; and that, ''where there is a sudden peril presented to a man he is not held to the exercise of the same judgment that he would be held to exercise under ordinary circumstances.'' The jury was also instructed that if they believed from the evidence that Tomten did attempt to pass defendant's automobile at about the place of the accident and in attempting to pass he cut in upon defendant's automobile and collided with it, and that his so doing was the sole and proximate cause of this accident and the resulting injury to the deceased, then their verdict must be for the defendant.

These instructions as given by the court became the law of the case and were binding on the jury as such. (*Harrington* v. *Butte Miner Co.*, 48 Mont. 550, 139 Pac. 451, Ann. Cas. 1915D, 1257, 51 L. R. A. (n. s.) 369; *Friesen* v. *Hart-Parr Co.*, 64 Mont. 373, 209 Pac. 986; *Allen* v. *Bear Creek Coal Co.*, 43 Mont. 269, 115 Pac. 673.)

Defendant contends that in rendering a verdict for plaintiffs, the jury disregarded and failed to follow the instructions outlined above, and that the verdict is against the law as given by the court. He asserts that the record fails to disclose any evidence to support the verdict. Thus we are confronted with the questions, first, whether there is sufficient evidence to sustain a finding that defendant was guilty of gross negligence; and,

second, if he was grossly negligent, whether that gross negligence was the proximate cause of Cowden's death.

The fact of the accident or collision alone is *no evidence of* negligence. (*Autio* v. *Miller*, 92 Mont. 150, 11 Pac. (2d) 1039.) Plaintiffs, however, assert and rely upon certain acts of negligence, to wit, failure to keep a proper lookout, particularly for vehicles attempting to pass; excessive speed (50 miles or more an hour); and defendant's failure to keep his car under control so that he could apply the brakes or bring the car to a stop on the traveled surface of the highway without the car wheels sliding or skidding on and off the highway.

Taking up these alleged elements of negligence in the order enumerated, we find that there is no evidence in support of the allegation that defendant failed to keep a proper lookout. The evidence on this point is uncontradicted and shows conclusively that defendant was over on his own side of the road; that he observed the Tomten car coming up behind him; that his vision was clear and unobstructed; that when Tomten honked his horn, defendant swung his car as far over to the right side of the road as he possibly could without driving entirely off the highway; and that he was actually driving with the right wheels on the graveled shoulder of the highway.

The elements of speed and control are so closely connected that we may with propriety and convenience discuss them together. As was said in the case of *McNair* v. *Berger*, supra: "Control and speed are so inseparably connected that it is doubtful whether the former could ever be said to exist when the speed is excessive. The test usually applied in determining whether a car is under control is the ability to avoid colliding with another who is using the highway and exercising proper care and caution on his own part." There is no specific legal limit or restriction placed on the rate of speed at which a car shall travel on the highways of the state. The only restriction of this character is that appearing in section 1742, Revised Codes 1921, which provides in part that: "Every person operating or driving a vehicle of any character on a public high-

204

way of this state shall drive the same in a careful and prudent manner, and at a rate of speed no greater than is reasonable and proper under the conditions existing at the point of operation, taking into account amount and character of traffic, condition of brakes, weight of vehicle, grade and width of highway, condition of surface, and freedom of obstruction to view ahead.'' A careful reading of the record fails to disclose any evidence to support plaintiffs' assertion that, in the light of conditions as they then appeared to defendant and the other occupants of the car, the speed at which defendant was driving at the time of the accident was so excessive and unreasonable that it might be characterized as gross negligence on defendant's part.

While there is some conflict in the evidence with reference ██ to the rate of speed at which defendant was driving, the exact rate of speed is of little importance. The pertinent question is whether the speed, whatever it may have been, was so excessive as to affect defendant's control over his car under the conditions which actually existed at that particular time and place, or as they reasonably appeared to defendant to exist. This is clearly the import of section 1742, supra. The evidence is uncontradicted that defendant had maintained approximately the same rate of speed continuously throughout the trip from the time he started at Glendive up to the point of the accident; that during the entire trip up to that time he appeared to have adequate control of the car; that there had been no slipping, skidding or weaving; that up to the time of the accident all the other occupants of the car apparently considered that defendant was a good, safe driver; and that he was driving at a reasonably safe rate of speed. Although they had proceeded for several miles on the alleged icy highway before reaching the point of the accident, there is no evidence that either the defendant or any of the other occupants of the car had noticed the slippery condition which is alleged to have existed on the oiled highway; in fact, the evidence is all directly to the contrary.

The evidence is uncontroverted that up to the point of the accident, defendant was maintaining a straight, steady course on his own side of the highway. There is no evidence which would even indicate that defendant did not have control of his car up to the point where the Tomten car struck his car. There is some conflict in the evidence as to whether defendant applied his brakes and slowed down when the Tomten car sought to pass around him. However, whether he applied his brakes or not, the evidence is clear that his car did not skid or slip sideways on the highway or pass out of control before reaching the point where it left the road when struck by the Tomten car. There is no merit in the suggestion advanced by plaintiffs that there was a duty resting on defendant to slow down when he became aware of the fact that Tomten desired to pass him. The only requirement of this nature is that appearing in subdivision 3 of section 1743, Revised Codes 1921, which provides that "the operator or driver of any vehicle upon a public highway, upon being overtaken by another vehicle and receiving a signal or notice from the operator or driver of the vehicle in the rear that he desires to pass, must, without unnecessary delay, make every reasonable effort to permit him to do so." The evidence shows that defendant complied with the provisions of this statute after he became aware that Tomten desired to pass him. There is no evidence that he speeded his car up at that time. On the contrary, there is considerable evidence that he applied his brakes and slowed down to some extent. Whether he did or did not slow down is of no great importance, because he was not necessarily required to decrease his speed.

On the whole, we are unable to find any evidence in the record to support the assertion that defendant was guilty of gross negligence in any of the particulars charged, or in any manner. Indeed, it is doubtful if the evidence could be said to support a charge of ordinary negligence. Even if it appeared that defendant was guilty of some degree of negligence, we fail to see wherein such negligence could be properly designated as the proximate cause of the accident, in view of the court's instruc-

206 ·

tions and the previous decisions of this court. (Compare *Autio* v. *Miller,* supra.) In spite of the alleged icy condition of the highway, defendant had his car under control and was proceeding in an apparently safe manner on the proper side of the road until his car was struck by the Tomten car. There is nothing in the record to controvert defendant's testimony to the effect that if the Tomten car had not hit him, he would not have gone off the road and would have been able to continue on to Miles City without mishap.

While there is some quibbling over the question of whether the Tomten car struck defendant's car, there can be no doubt that such was the fact. Both the complaint and the answer allege that the two cars did collide, and practically all the evidence bearing on the question points to the fact that there was such a collision. It is true, of course, that in such a situation there might have been concurrent negligence on the part of defendant and Tomten. That is the theory of plaintiffs in this case. If such concurrent negligence were proved, then defendant and Tomten would be jointly and severally liable, and plaintiffs might recover from either or both. (*Marinkovich* v. *Tierney,* 93 Mont. 72, 17 Pac. (2d) 93; *Jones* v. *Northwestern Auto Supply Co.,* 93 Mont. 224, 18 Pac. (2d) 305.) But the evidence fails to show that the slippery condition of the road, or that the speed maintained, had anything to do with the car running into the ditch and turning over. There is no evidence tending to show that the defendant might have foreseen the accident (*Burns* v. *Eminger,* 84 Mont. 397, 276 Pac. 437), or that defendant should have anticipated that some accident was likely to happen as the reasonable and natural consequence of the manner in which he was driving. (*Mize* v. *Rocky Mountain Bell Tel. Co.,* 38 Mont. 521, 100 Pac. 971, 129 Am. St. Rep. 659, 16 Ann. Cas. 1189.)

Defendant, while proceeding in a lawful manner on the proper side of the highway, had a right to assume that anyone attempting to pass around him would proceed in a lawful manner and on his own side of the road, as required by statute.

(Sec. 1743, supra; *McGregor* v. *Weinstein,* 70 Mont. 340, 225 Pac. 615; *Gosma* v. *Adams,* 102 Fla. 305, 135 So. 806, 78 A. L. R. 1193; *Swartz* v. *Feddershon,* 92 Cal. App. 285, 268 Pac. 430; *Hickerson* v. *Jossey,* 131 Or. 612, 282 Pac. 768, 283 Pac. 1119; *Curtis* v. *Perry,* 171 Wash. 542, 18 Pac. (2d) 840.) This court has held that "the person passing [as Tomten was attempting to do here] is negligent if he so carelessly directs or manages his automobile that a collision results, or if he attempts to pass at a time or under conditions which are not reasonably safe." (*McDonough* v. *Smith,* 86 Mont. 545, 284 Pac. 542, 544.) To us it seems manifest that Tomten was guilty of negligence. Of course, as we have indicated, if defendant were also negligent, he would not be relieved simply because of Tomten's negligence. We fail to find any evidence supporting the assertion that defendant was negligent. Certainly he was not grossly negligent. The evidence, taken as a whole, points clearly to the fact that the contact between the two cars was the cause, and the only cause, of defendant's car leaving the road and of the injuries incurred thereby. This impact or collision between the two cars was due solely to Tomten's fault or negligence without concurring negligence on the part of defendant. In other words, Tomten's negligence was the sole and proximate cause of the accident.

In many respects this case is similar to the cases of *Staples* v. *Blinn Lumber Co.,* 97 Cal. App. 387, 275 Pac. 813, and *McDonald* v. *Cantley,* 214 Cal. 40, 3 Pac. (2d) 552, wherein roadside third parties damaged or injured by a car crowded off the road by a passing car turning too close were denied recovery against the driver who was crowded off the road. It was held that the reckless driving on the part of the car attempting to pass was the direct and proximate cause of the accidents. It is worthy of note that in both those cases it was held that the driver who was crowded off the road was not guilty of even the ordinary negligence necessary there in order to fix liability on the defendants. Here, as already pointed out, before de-

fendant can be held liable, he must be shown to have been guilty of gross negligence.

A careful investigation of all the evidence as to the proximate cause of the accident and the alleged gross negligence of defendant leads to what seems to us to be an inevitable conclusion, viz., that the essential facts are either admitted or undisputed, or that the evidence with relation thereto is "all in one direction," and that therefore the matter became a question of law for the decision of the court. (See *Davidson* v. *Stagg*, 94 Mont. 272, 22 Pac. (2d) 152; *Morton* v. *Mooney*, 97 Mont. 1, 33 Pac. (2d) 262.) It was error to submit the case to the jury. It is likewise clear that under the court's instructions the verdict of the jury is without substantial evidence to support it.

Defendant urged several other specifications of error, but in view of the conclusion reached it will not be necessary to discuss them.

The judgment of the district court of Custer county is reversed, with direction to enter judgment for the defendant.

ASSOCIATE JUSTICES MATTHEWS, ANDERSON and MORRIS concur.

MR. CHIEF JUSTICE SANDS: I dissent. The majority opinion in this case has reached the conclusion that the verdict of the jury is unwarranted on the theory that the testimony was insufficient to hold the defendant guilty of gross negligence in causing the death of L. E. Cowden in an automobile accident near Miles City. There is no serious suggestion that there was error in the introduction of testimony, in the instructions to the jury, in the amount of the verdict, or that the jury was improperly influenced.

The fundamental law of the land inherited from generations back provides for the determination of the facts of each lawsuit by a jury of twelve disinterested citizens. The jury determines the facts, and the court determines the law. But this theory has been gradually modified by courts in recent genera-

tions to the extent that a very large percentage of our cases fairly tried by a fair jury are reversed by supreme courts and either sent back for a new trial, or dismissed as unwarranted. Supreme courts have practically abrogated the duty of the jury or at least often far exceeded their just authority in my opinion. Jurymen from the common body of the people and more in touch with the conduct and impelling forces that actuate the common people are possibly, indeed probably, better able to interpret the effect of commonplace conditions than the judges who are often too technical and inclined to review circumstances appearing at the trial with a one-sided partiality. It is therefore a confirmed principle with me, except in extreme cases, that it is improper for a court to review and weigh the evidence with a view of rendering a new verdict. There might be extraneous circumstances which would so prejudice a jury at the time of the trial that the court would be warranted in setting it aside on the ground of prejudice. There are no circumstances warranting any conclusion of that kind in the instant case.

But so long as this court has determined that there was not sufficient evidence of gross negligence to sustain the verdict, I revert to the testimony to explain a few of the reasons why I think the jury rendered the verdict that it did in this case. Justice Stewart has set out much of the testimony. I will not repeat, as he has in his usual fair manner correctly stated the facts which most seriously impressed him. I rely principally on the testimony of the only eye-witness, the farmer Fred Hansen, living many miles from the residence of the parties. He appears to be wholly disinterested. He testified that he was in his barnyard approximately a quarter of a mile distant from the road, and used this to me convincing language: "All I can say is that I heard a car doing a lot of honking out in the road as I was in the barnyard, and that is what drawed my attention, and I turned around and saw these cars going down the road between fifty and sixty miles an hour, and at the speed they were going I went in the house and I said to my wife,—well,

I went to the house and I watched these two cars and I had in mind something was going to take place, and I stood there and watched them until it came to a climax. I don't know what the one car was, I knew the one was a Chevrolet. The way it looked to me, he was trying to pass this Studebaker or whatever it was,—I could tell it was a big car,—and I stood right there and watched them, and this Chevrolet kept gaining on the big car, and I couldn't say whether they hit or not, but from where I was and the way it looked, the Chevrolet hit this big car, and the way it looked from where I was, when the Chevrolet hit the big car, the big car started rolling over, it went end over end. It went end over end four times as near as I could see. From that point where I was standing, it was about sixty rods. I observed the cars on the road for a distance of between half and three-quarters of a mile. There was not a thing to obstruct my view there, and I saw them about that distance. Yes, I heard the honking of the horn, it was three or four times. Yes, that was the car I described as a Chevrolet. There was no response made by the large car to the honking of the horn that I observed, and he held his speed right along. After this I went back in the barnyard and got my saddle horse and went down there. Yes, I went over on my horse, and when I got there I saw the two wrecked cars. After I got down there I saw where the Studebaker had skidded I would say about thirty feet.''

The witness was attracted by the horn. He watched the two cars for a distance of a half to three-quarters of a mile. He went from the barnyard to his house. He ''had in mind something was going to take place.'' He talked to his wife about it before the ''climax.'' This testimony establishes that the circumstances were uncommon. He scented danger—he knew the slippery condition of the road. The speed of both cars was apparent and apparently suggested danger. He [defendant] ''held his speed right along.'' It is unfortunate the witness was not permitted to detail the conversation with his wife, but

this is one of those cases where the rules of evidence do not permit.

It appears to me from this evidence the cars must have traveled close together for quite a distance. The honking of the car would suggest to me that the defendant was reluctant to let the boy driving the Chevrolet car go past him, and the boy, when he did get by, boy like, crowded over and caused the accident. There appeared little doubt that the boy was grossly negligent, but the driver of this car, a man of mature age, should have taken into consideration the fact that the passing car was being driven by a boy. The road was very slippery and the rate of speed was very high under the circumstances. The defendant was perhaps within his rights in giving half the road, but it was no time or place for him to closely insist on his rights. If the boy was violating the road laws there was a safe and sane remedy. Indeed, it was the duty of the driver to report to the proper authorities of the road violation by this boy and perhaps thereby save an accident of similar character at some other time. This circumstance may have appeared to the jury as it does to me, and on such suggestion they may have rendered their verdict.

However, there is another feature that should be considered. The defendant testified that he did not know the road was icy until after the accident. He was driving and it was his duty to know the condition of the road. All of the other witnesses testified that the road was icy and slippery. The testimony of the other men in the car that they did not know the road was icy is no excuse. They were not paying attention to the driving, knowing full well that the man at the wheel was perfectly capable of doing the driving himself, and there was no time to protest to the driver. He could not be bothered by protests while the other car was passing.

The testimony relative to the speed of the cars varies very much. The jury was entitled to believe that the car was running at as high a rate of speed as sixty-three miles per hour, which is too fast on an icy, slippery road.

I view this testimony in the light of common experience and frequent newspaper accounts of accidents. It behooves the court to protect the public from reckless driving, and while an innocent man should not be held liable for an unavoidable accident, the testimony of the driver should be viewed very critically. Therefore my dissent.