DAVID L. FARRIS, Plaintiff and Respondent, v. LOUISE F. CLARK, as Guardian Ad Litem of Rickey J. Clark, Defendant and Appellant. ROBERT H. SENECAL, Plaintiff and Respondent, v. LOUISE F. CLARK, as Guardian Ad Litem of Rickey J. Clark, Defendant and Appellant.

No. 11958.
Submitted June 21, 1971.
Decided August 10, 1971.
Rehearing Denied September 1, 1971.
487 P.2d 1307.

·· MR. JUSTICE HASWELL concurred specially and filed Opinion.

Patrick F. Hooks, argued, Townsend, Henningsen & Purcell, James E. Purcell, argued, Butte, for defendant-appellant.

J. L. McKeon, argued, Anaconda, Holland, Holland & Haxby, David L. Holland, argued, Butte, for plaintiffs-respondents.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal from judgment entered on a verdict in the District Court of the Second Judicial District in favor of plaintiff Robert H. Senecal for personal injuries received in an automobile accident, for plaintiff David L. Farris for the loss of his automobile in the same accident, and against defendant Louise F. Clark, as guardian ad litem of Rickey J. Clark. Hereinafter the parties to the action shall be referred to by name.

Early on the morning of January 25, 1970, during darkness, Senecal was driving on a divided interstate highway about eight miles west of Butte, Montana, when his automobile was struck from the rear by a vehicle driven by Rickey Clark, minor son of Louise Clark, defendant herein. The automobile driven by Senecal was a 1961 Cadillac owned by plaintiff David Farris, and loaned to Senecal.

The interstate highway at the scene of the accident is a four lane highway with two lanes of travel each way, separated by a dividing strip. Rickey Clark, driver of the colliding vehicle, described the accident as follows:

"Well, I came up as I pulled over this hill and started going down a slight decline, I saw the car in front of me and I went to pass him, and as I passed, the power steering failed and I felt the hardness of the wheel, and so I jerked it and put on the brakes and then we impacted."

Rickey Clark, in his deposition, testified he was traveling between 60 and 65 miles per hour, just prior to the impact.

Senecal's version of the accident was that he was driving a date home to Butte from Anaconda, when he was hit by the Clark car and driven some 170 feet into a barrow pit; that the Clark car after the collision went across the eastbound lane, across the divider and onto the westbound lane, some 240 feet.

Although Senecal was not hospitalized as a result of the accident, he did consult a doctor some three days later. At that time he received medication and was provided with a neck brace.

He later consulted and received treatment from orthopedic and neurological specialists.

The Cadillac owned by Farris and driven by Senecal, was totaled out by the accident. The exhibits show the right fender, the right front bumper, the grill work, and hood of the Clark car to be damaged. The Cadillac was struck in the left rear part of the car with such force that the left rear fender was damaged, the luggage door forced open, the driver's seat broke or sprung loose, the jockey box snapped loose, and the frame badly bent. It was towed into Butte where it was stored for a number of months. Farris, in his complaint, asked for storage and towage fees, plus $1,500 for the value of the car. The jury awarded him $1,500 for the car, plus $231 for storage and towage.

Senecal was awarded $25,000 for personal injuries he alleged arose as a result of the accident. The trial court had previously granted Senecal's motion for a partial summary judgment on the issue of liability, on the basis of the discovery depositions available to him.

Four issues are argued by defendant on appeal:

(1) The trial court erred in granting plaintiff Senecal's motion for partial summary judgment on the issue of liability.

(2) The trial court erred in permitting the jury to consider the testimony of plaintiff Senecal's doctor.

(3) The verdict for Senecal was excessive.

(4) The damages awarded Farris were excessive and not within the limitations set by law.

As a result of the trial court's decision to grant summary judgment as to the question of liability, the only question left for the jury was the amount of damages claimed by the plaintiffs. Therefore, in order to properly review the trial court's decision as to the question of liability, it has been necessary for this Court to consider the depositions of Senecal, Rickey Clark and Mrs. Louise Clark, as was done by the trial judge in arriving at his decision. We find no error in the trial court's decision to grant Senecal's motion for summary judgment. Hager v. Tandy, 146 Mont. 531, 410 P.2d 447.

██ ██ Recognizing that the burden of proof is always on the party moving for summary judgment, Mally v. Asanovich, 149 Mont. 99, 423 P.2d 294, we find here, on the facts revealed in the depositions, that summary judgment was properly granted. The facts show:

1. That defendant's car easily overtook and attempted to pass Senecal's car which was estimated to have been traveling 55 miles per hour.

2. The accident occurred at nighttime when Clark had to depend upon his driving lights in judging the distance between his car and that of Senecal's before making his attempt to pass.

3. That Senecal was driving in the right lane of traffic and was in no way contributorily negligent.

4. That the Senecal car was hit with such force as to knock it down the highway some 170 feet.

5. Accepting Clark's statement that he was traveling between 60 and 65 miles per hour when he approached Senecal's car to within 20 to 25 feet before attempting to pass, it is clear that he was negligent in following too close at that speed. Particularly is this true where, as here, the left lane was clear for Clark's use. Section 32-2160 and section 32-2153, R.C.M.1947.

This Court long ago ruled on the liability of a person who negligently collides with another vehicle while attempting to pass. In the case of McDonough v. Smith, 86 Mont. 545, 550, 284 P. 542, 544, this Court held:

"The person passing is negligent if he so carelessly directs or manages his automobile that a collision results, or if he attempts to pass at a time or under conditions which are not reasonably safe."

See also Cowden v. Crippen, 101 Mont. 187, 53 P.2d 98; State v. Biering, 111 Mont. 237, 107 P.2d 876; 85 A.L.R.2d 661.

██ Defendant argues that under our holding in *Mally,* and in view of her allegations that the power steering failed thereby causing the accident, that summary judgment should not have been granted. It should be noted here that defendant argues the "power steering" became inoperable—not the steering. Her

son testified that on manual steering it was more difficult to steer, particularly at the speed he was traveling. The loss of power steering is not a defense for failure to pass at a safe distance or drive at a speed commensurate with the highway conditions.

In support of her position, defendant sets forth several cases and authorities: Hagen v. Great Northern Railway Co., 153 Mont. 309, 456 P.2d 51; Burnett v. Avera (Miss.1967)), 203 So.2d 788; 8 Am.Jur.2d, Automobiles and Highway Traffic § 704, p. 255; 23 A.L.R.2d 532. However, we note that these cases pertain to accidents where the defect in the automobile made the vehicle uncontrollable. That is not the situation here. In England, it is said:

"It is a law of the road,
   Though a paradox quite,
   If you keep to the left,
   You'll always be right."

So be it here.

The second issue on appeal pertains to the admission of certain medical testimony. In all, five doctors were involved in this case. The first doctor to see Senecal, three days after the accident, was Dr. Callan of Anaconda who did not appear as a witness. Dr. Callin sent Senecal to Dr. Harold F. Hagan, a radiologist, on January 27, 1970. Dr. Hagan took X-rays from which he testified that Senecal evidenced minimal arthritis in the neck and back, normal for a person of 40 years; that there was a straightening of the lordotic curve which, in his opinion, was caused by a muscle spasm; that there was some strain of the musculature of the neck, all of which could have been caused by the violence of the rear end collision.

After the accident Senecal hired counsel and because of the nature of his alleged injuries he was thereafter referred to Dr. Henry Hogan, a specialist in neurology and psychiatry, practicing in Missoula. Dr. Hogan sent him to Dr. Eugene Drouillard, a Missoula radiologist, for X-rays and diagnosis. Dr. Drouillard made special studies of Senecal's neck and back, con-

sisting of taking a tape recording of the neck and back, using a closed circuit television. This examination consists of a procedure where the patient is placed on a stool so that he is in the image area of the TV camera and then having him voluntarily tip his head forward and backward several times, encouraging the patient to do this as far as he can in both directions. Then the attending radiologist takes the patient's head and tries to increase the motion as far as possible to get the full range of motion. After all of this has been recorded several times, the tape is played back several times, in slow motion and with stop action. The tape becomes not only a diagnostic tool, but a permanent record of the examination.

It was Dr. Drouillard's opinion, based on his examination, a report of which was sent to Dr. Hogan, the referral doctor, that there was a narrowing between c-5 and c-6 vertebrae with spurs posteriorally; that there was a degeneration related probably to a previous injury; that there was a limitation of motion between vertebrae c-4 and c-5, and c-5 and c-6, which would probably remain limited. Dr. Drouillard further testified that because it was hard to determine the cause of Senecal's present disability, that Dr. Hogan, after receiving the report, wanted a myelogram done. Dr. Drouillard did not recommend a myelogram.

Dr. Henry Hogan also testified for Senecal. Dr. Hogan saw Senecal for the first time on May 13, some five months after the accident. He testified that Senecal complained of pain in his neck, left shoulder, and upper part of his back and of constant fatigue, of lack of work tolerance and difficulty in sleeping.

After taking Senecal's history, Dr. Hogan conducted a neurological examination to determine whether the nerve supply to any part of the body was damaged. Using the Romberg test and other special techniques he found Senecal's sensory system normal. However, the examination revealed difficulties when the occipital nerve was compressed, causing pain bilaterally.

When this problem was encountered, Dr. Hogan sent Senecal to Dr. Drouillard for the X-rays and the motion studies previ--

40

ously referred to. After several examinations, Dr. Hogan believed the signs pointed to some damage to the cervical region. Using Dr. Drouillard's reports to assist him in his diagnosis, it was Dr. Hogan's opinion that Senecal suffered from a muscle spasm, the treatment for which is to cure the damaged joint so that the muscles no longer had to be in spasm. It was his opinion from the X-rays and the spine motion study that Senecal's joints had been damaged; that he had limited movement of head and neck; and that there was a narrowing of one of the interspaces. Dr. Hogan further testified, in considering future treatment for Senecal, that he was:

"* * * concerned lest he had, because of his arthritis, lest he have an unusual amount of arthritic overgrowth inside the spinal canal, or lest he have a protrusion or a disc, the spongy material adjacent to the bodies of the vertebrae, and if there were a rupture of a disc, this disc rupture, of course, would cause pressure against nerve roots more on one side than the other, or possibly against the spinal cord itself, and in which case some surgical intervention would be imperative right now."

Following this diagnostic testimony, Dr. Hogan was asked: "Q. We can't rule out a disc in this gentleman, a——." At this point the court sustained an objection to the question, as being a leading one. Dr. Hogan was then asked what further diagnostic test was proposed and he replied: "We had tentatively set up a cervical myelogram * * *." The record does not reveal whether a myelogram was ever done.

In an effort to establish that there was a ruptured disc, the following occurred between court and counsel:

"Q. Doctor, do you have an opinion based upon a reasonable degree of medical certainty as to the medical probability as to whether Mr. Senecal has or has not a cervical disc? A. Yes, I have an opinion.

"Q. What would your opinion be? A. I suspect that he has a disc.

"MR. HOOKS: Move to strike the answer to allow an objection.

"THE COURT: Sustained.

"Q. Doctor, I'll rephrase the question. Based upon your feelings and a reasonable degree of medical probability, do you have an opinion as to whether or not he has a cervical disc?

"MR. HOOKS: Object to that, it is the same question he asked before. It is repetition and I object to the form of the question. He is using the word 'probability,' and that is not the way the question is supposed to be formed.

"THE COURT: He has already answered that yes, he does have that in his mind.

"Q. What is your opinion, Doctor?

"THE COURT: We want your direct opinion here, Doctor.

"THE WITNESS: Your Honor, I can't say that he has or has not a disc. I have it in mind as something to consider.

"Q. Doctor, most of these cases, would you agree with this statement, most of these cases involving this type of injury with the findings you have found involve a cervical disc eventually?

"MR. HOOKS: Objected to on the ground he is assuming facts not in evidence, it is leading, and there is no proper foundation for it.

"THE COURT: Overruled. He may answer.

"A. Well, I would say that most of these cases have a cervical disc, herniation or rupture as a consideration in the differential diagnosis.

"Q. How do you repair a cervical disc?

"MR. HOOKS: Objected to as irrelevant in view of the answer given.

"MR. McKEON: We have come to the point where the Doctor in good faith has stated that's as far as he can go without an operation. He has given his opinion.

"THE COURT: He hasn't given his opinion. He hasn't stated yet whether the man has a ruptured disc or not. 'Suspect,' that is not sufficient. He's got to say he does or doesn't in his opinion. If he doesn't, I don't know how you can go further on it.

"Q. Doctor, we are not asking for a guarantee. The Court

realizes you can't give a guarantee. But, Doctor, based on what you have discussed so far with Mr. Senecal, do you have an opinion as to whether or not he may have a cervical disc, reasonable probability?

"THE COURT: The objection is overruled and he may answer that question.

"A. Yes, I have an opinion.

"Q. What is that opinion? A. I think that he probably has a cervical disc rupture.

"Q. That's based on a reasonable degree of medical certainty? A. Yes.

"Q. Now, Doctor, do you have an opinion as to whether or not his condition is a permanent condition? A. Yes.

"Q. What is your opinion? A. I think it is permanent."

Defendant argues that this testimony establishes no more than the possibility of a ruptured disc, therefore, the testimony fails to come within the ambit of LaForest v. Safeway Stores, Inc., 147 Mont. 431, 437, 414 P.2d 200, 203 and Stordahl v. Rush Implement Co., 148 Mont. 13, 19, 417 P.2d 95. Both of these cases concern medical testimony based on "possibility." *Stordahl* specifically holds that medical testimony must encompass a reasonable degree of medical certainty as a requisite proof.

Here, all the medical witnesses testified at considerable length, including Dr. Burke, a radiologist, who testified as an expert witness for the defense and who found no disc problem.

The standard for the certainty of medical evidence was set forth in *LaForest* and *Stordahl,* cited heretofore, and both recent cases of this Court.

In *LaForest* this Court said:

"We will agree that even after a thorough examination of the shoulder, during an operation, which revealed no evidence of a supraspinatus tendon tear, a 'possibility' still remains that such a tear exists. However, the above-quoted expert testimony establishes a far greater probability of the absence of such a tear. The claimant has the burden to establish by a preponderance of the evidence that her condition resulted from an injury

and not from a disease. (Newman v. Kamp, 140 Mont. 487, 374 P.2d 100.) She has not sustained the burden of proof. Not only does a fair reading of the medical evidence preponderate against the claimant, there is no substantial credible medical testimony to the contrary. By adroit questioning, claimant's counsel was able to get Dr. Davidson to admit to a 'possibility,' of a supraspinatus tendon tear. *However, such a 'possibility' is not probative credible testimony and will not, without more, supply evidence.''* (Emphasis added.)

In *Stordahl,* we said:

''Not every supposition or theory of a witness concerning *what might be* has the force of evidence, even though he be licensed to practice medicine. The utter absence of statistical data and absence of scientific understanding when compared to authoritative data such as the Ewing postulates minimizes such testimony. There is no present rule to hold doctors to strictness in testifying that was once required provided it can be determined that their testimony encompasses a reasonable degree of medical certainty. The form of the answers is far less important than the context and circumstances. There always should be, however, some positive pertinent evidence of a basis for the opinion. The marked propensity of recent years of resorting to the acceptance in one case of the 'possible' as meaning reasonable medical certainty cannot be countenanced as treating every 'possibility' as adequate to establish the fact sought to be proved. Everything in this troubled world is 'possible' and that is particularly true in the scientific world. * * *

''Whenever a medical expert testifies that an asserted cause of disease is *possible,* this alone is not to be accepted as reasonable medical proof. Causes of cancer are unknown to science and if this trend continues, everyone unfortunate enough to be afflicted with this deadly killer could secure medical testimany, electing the best incident that the disease was contracted from any of many different traumas and exposures that would sustain a holding of liability of some responsible defendant.

"It is not the intent of the law that the less known of any disease the greater the 'possibility' of a favorable judgment in court. The reasonable and normal rule must be maintained, that is that the party asserting the claim has the burden proving causation under our statute."

Throughout the examination of Dr. Hogan, particularly when both counsel and the court tried to tie down "cause and effect," the doctor used the words "suspect," "possible" and "probable." While we no longer hold the medical profession to the strictness once required in testifying, still the sum total of the testimony must contain a degree of medical certainty. Here, Dr. Hogan's testimony fails to give us that degree of certainty.

Too, here it should be noted that although Dr. Hogan believed a cervical myelogram was necessary to properly make a diagnosis, none was taken. Dr. Drouillard seemed to have disagreed, in that he did not recommend a myelogram. We are therefore at a loss to know whether or not this diagnostic procedure would have given the medical certainty necessary to sustain the cause.

We have held that the granting of summary judgment on the issue of liability was correct. We recognize that some damage and injury resulted from the accident. However, the proof as to both the severity and permanency of the injuries to Senecal, as presented to us in the record, is cloudy and inconclusive. For these reasons the verdict and judgment awarded plaintiff Senecal are reversed and a new trial is ordered.

Issue No. 4 concerns the damages awarded to Farris, alleged by defendant to be excessive. The jury returned a verdict in the sum of $1,731 for damages to the 1961 Cadillac. The testimony showed that the market value of the vehicle at the time of the accident was $1,250, although the dealer testified that on resale he would have priced the car at $1,500. In addition, testimony revealed Farris was charged $231 for towage and storage fees for a vehicle that was admittedly a total wreck after the accident. Obviously the jury took the highest value the car might bring on resale and added thereto the towage and storage fees.

This Court set forth the rule for the proper measurement of such damages in the cases of Spackman v. Ralph M. Parsons Co., 147 Mont. 500, 414 P.2d 918 and Stahl v. Farmers Union Co., 145 Mont. 106, 399 P.2d 763. Under the doctrine set down in these two cases, it was error for the jury to award Farris a sum inconsistent with the proof of loss submitted. The jury award should have been limited to the market value of the car plus towage and storage fees, $1,250 plus $231, or a total of $1,481.

Therefore, we scale down the award to Farris to $1,481, as compensation for the value of the car and out-of-pocket expense to Farris. If this scaled down judgment be accepted by Farris within 10 days after remittur, the judgment as to Farris, as so modified, is affirmed. If such scaled down judgment be not accepted, the judgment as to Farris is reversed as to damages alone, affirmed as to liability, and remanded for trial on the issue of damages, in conformity with our discussion herein.

It is so ordered.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES DALY, and CASTLES, concur.

MR. JUSTICE HASWELL (specially concurring):

I concur in the result reached by the majority, but disagree with their rationale in setting aside Senecal's $25,000 judgment and awarding a new trial as to his damages.

In my view the record establishes no more than that Senecal suffered a neck injury in the accident with accompanying pain and limitation of motion. Neither its nature or permanence were established by expert medical opinion to a reasonable medical certainty or by nonexpert substantial credible evidence. In my view the proof is insufficient to establish an injured or herniated cervical disc because (1) plaintiff's medical expert had his facts wrong, believing that the injury occurred one year earlier than it did, and (2) there were equal alternative possibilities unrelated to the accident (tumor, overgrowth of arthritis, excessive thickening of ligaments from osteoarthritis).

While a jury verdict is conclusive unless the amount awarded is so out of proportion to the injury to shock the conscience, Rasmussen v. Sibert, 153 Mont. 286, 456 P.2d 835 and cases cited therein, a $25,000 verdict on the foregoing minimal injury whose permanence and relationship to the accident were not proven, meets this test and justifies this Court in setting aside the award.