McNAIR, RESPONDENT, *v.* BERGER, APPELLANT.

(No. 6,944.)

(Submitted September 21, 1932. Decided October 26, 1932.)

[15 Pac. (2d) 834.]

442

444

Mr. R. F. Gaines, for Appellant, submitted a brief and argued the cause orally.

446

448

*Mr. J. B. C. Knight* and *Messrs. Clift & Glover*, for Respondent, submitted a brief; *Mr. R. H. Glover* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

Plaintiff sustained injuries on July 29, 1928, as the result of a Buick automobile, in which he was riding, being driven by the defendant into another automobile used as a wrecker, standing on the main highway between Butte and Anaconda. He brought this action to recover damages. The jury awarded him $30,000, for which judgment was entered. Defendant's motion for new trial was denied and he appealed from the judgment.

The complaint charges negligence on the part of defendant in driving at an excessive rate of speed, in failing to have the automobile under control, and in running it into and against the wrecker when there was ample room to pass by it in safety. The answer admits the collision and that as a result plaintiff sustained injuries, but otherwise amounts to a general denial. As an affirmative defense it pleads contributory negligence on the part of plaintiff. The affirmative allegations of the answer were put in issue by the reply.

The evidence, omitting unimportant details, discloses that plaintiff, defendant and Neill Wilson, upon invitation, together attended a dance at the Anaconda Country Club on the night of July 28, leaving there after midnight to return to Butte. Plaintiff was then twenty-five years of age. Plaintiff

and Wilson had been schoolmates, but defendant was a stranger to plaintiff. In the evening of July 28 the three met in Butte and it was decided that they would go to the dance in defendant's car. Defendant had one or two drinks at a "soft-drink parlor" in Butte before they left for the dance, but plaintiff did not know what the drinks consisted of. He himself had no drinks. On the way to the dance, and before reaching Gregson Springs, defendant and Wilson drank from a small container which plaintiff guessed was a whisky bottle. They stopped at Gregson Springs before proceeding to the dance, where they engaged in gambling, and defendant and Wilson had some drinks there but plaintiff did not know whether it was intoxicating liquor or not. From there they went to the Anaconda Country Club. Defendant drove the car and did so at a reasonable speed and in a careful manner. There was evidence that plaintiff was reasonably assured that defendant had something to drink while at the Country Club but not to the extent that it had any effect on him, judging from his actions.

Before leaving the Country Club plaintiff, who said he was always nervous when riding in cars, and because he thought that defendant had some drinks, told Wilson to ask defendant if he wanted plaintiff to drive home. Wilson, instead, asked defendant if he, Wilson, should drive, and defendant replied that he could drive all right. Plaintiff, before getting into the car at the Country Club to return to Butte, looked at defendant carefully, and said that he appeared to be sober; that "he walked and talked all right, and I saw him dancing the same as any other person would dance. * * * He was not talkative or hilarious or anything of that kind so as to indicate that he had been drinking."

There was a dirt road from the Country Club to the main highway. This road was traversed by defendant in a careful manner. Upon reaching the main highway, which was paved, defendant accelerated his speed. Plaintiff's version of what then transpired is as follows: "When we got onto the pavement Mr. Berger accelerated his machine and we gathered

speed to a point where I became nervous and I made a remark something to the effect of 'what is the hurry.' And he apparently paid no attention to that, but built up more speed, and I then told him that we had all night to get home in. And after one of those remarks the only reaction I got from him was that he rather smiled and stepped harder on the throttle. It was night and we were gaining momentum all the time and we passed several cars and I was very nervous. Then we came to these two little jogs in the road this side of where the accident occurred, and he went into those curves at an excessive rate of speed. I know on one of those curves he frightened me so that I stiffened out so that my trousers were off the cushion and my weight raised from my feet to the back of the seat, and I said, 'For Christ's sake slow down!' In going around those curves the car tilted, and I could hear the tires sing as they do when you go around a corner fast. After we came out of those curves he continued to go still faster. In going around these curves he did not stay on his side of the pavement, but rounded the curves; and at one of the curves I thought he was going to go off the pavement, but he managed to stay on. He continued to go still faster. I have always been nervous in a car and I was certainly nervous that night passing those cars and driving at such an excessive rate of speed, and for some distance I rode looking down into my lap and trying to get hold of myself, and as I was looking down I rather glanced up a little and saw the speedometer, and I could see that the needle was pointing at seventy miles an hour, and I looked up and saw some lights and we hit the wrecker. I did not know at that time just what it was we hit.''

From the record it appears that the paved portion of the highway was eighteen feet wide and at that time there was a five-foot graveled shoulder on each side of the pavement. The wrecker was standing on the highway with its engine running and with both headlights, a spread light between them, a tail-light, and a working light, all lighted. The working light was focused on a Ford car in the ditch beside

the road. Those in control of the wrecker were about to use
it for the purpose of taking the Ford car from the ditch.
There was a gradual curve in the road at the place where
the wrecker stood. It stood on the right-hand side of the
road going to Butte but was facing in the general direction
of Anaconda. There was ample room on the paved part of
the highway to allow cars to pass the wrecker. Both of the
left wheels and, according to some of the evidence, the right
rear wheel of the wrecker were off the paved portion of the
highway. The right front wheel was on the pavement, thus
placing the wrecker in an angling position across the right
portion of the highway going towards Butte, so that the lights
would not point directly up the pavement but in an angling
direction toward the right side of the road going towards
Anaconda. There is evidence that the wrecker weighed 4,500
pounds. It was standing between forty and fifty feet towards
Anaconda from a certain culvert. The brakes on the wrecker
were set at the time of the collision.

When the cars came to a stop after the impact the wrecker
was facing Butte and was situated in the ditch beside the
culvert upside down, and the Buick came down on its side
on the pavement near the culvert and burst into flames.
Wilson was killed as the result of the collision, and plaintiff
sustained serious injuries which will be hereafter more fully
explained.

Aside from the testimony of plaintiff there was evidence
that defendant's car, as it hit the wrecker, was moving
at sixty miles per hour, or more. Defendant contends that the
evidence is insufficient to show that his negligence as charged
was the proximate cause of plaintiff's injuries. The question
was raised on motion for a directed verdict.

The rule of law existing in this jurisdiction at the time
the plaintiff was injured made it incumbent upon the driver
of an automobile to use reasonable care for his guest's safety.
(*Liston* v. *Reynolds*, 69 Mont. 480, 223 Pac. 507; *Hornbeck*
v. *Richards*, 80 Mont. 27, 257 Pac. 1025.) By Chapter 195,
Laws of 1931, the rule has been changed so that the driver

is liable to his guest only in case of injury caused by his "grossly negligent and reckless operation." But Chapter 195 has no application to cases arising prior to its passage and approval.

Whether the injury sustained is the proximate consequence of defendant's wrongful act is ordinarily a question for the jury, and it is only where the court is able to see from the undisputed facts that the injury is a remote, and not the proximate, result of defendant's act that the question becomes one of law for the court. (*Boyd* v. *Great Northern Ry. Co.,* 84 Mont. 84, 274 Pac. 293.)

"In determining the proximate cause of an injury or accident, we must always look to the succession of events existing in every transaction, more or less dependent each upon the preceding event, and it is the province of the jury to look to such succession of events and ascertain whether they are naturally and probably connected with each other by a continuous sequence or are dissevered by new and independent agencies, and this must be determined in view of the circumstances existing at the time. (*Milwaukee etc. Ry.* v. *Kellogg,* 94 U. S. 469, 24 L. Ed. 256.) If this sequence of events leads up to and results in the injury without intervening independent cause, it is the efficient and proximate cause." (*Burns* v. *Eminger,* 84 Mont. 397, 276 Pac. 437.)

The wrecker was making a proper and necessary use of the highway under the emergency existing. (*Kastler* v. *Tures,* 191 Wis. 120, 210 N. W. 415.) Its lights were properly lighted. There was no evidence of an intervening independent cause aside from defendant's negligence, which the jury could reasonably have said was the proximate cause of plaintiff's injuries, unless it was plaintiff's own contributory negligence,— a question which we shall discuss elsewhere herein.

If, as his counsel contends, defendant had a right, when he first saw or should have seen the lights on the wrecker, to assume that it was a car moving in the direction of Anaconda and which he was about to meet, still it was for the jury to

say whether he should not have slackened the speed of his car upon approaching it.

The evidence was amply sufficient to warrant the jury in finding that defendant's negligence, as alleged, was the proximate cause of plaintiff's injuries.

Defendant assigns error in the refusal of the court to give the following instruction offered by him: "You are instructed that it is another principle of law, or another rule, that even if you should believe that a man was negligent at a certain time or in a certain way, that is not enough; you must further determine that the negligence was what is called the proximate cause of a result. For instance, in this case plaintiff has charged that defendant was guilty of negligence in certain things; now even if you should believe that defendant was negligent, that would not be enough. You must further ask yourselves, was anything that you may believe defendant did negligently, the proximate cause of any injury which plaintiff has claimed and which you may believe he has suffered. This thing called 'proximate cause' is not easy to describe and may be hard to understand; but as the law defines it, it is this: If a person does something which an ordinarily careful and prudent person would or should figure would be liable to injure another, the way things usually go in this world, then the thing which is done may be said to be the proximate cause of whatever happens. On the other hand, if in the ordinary course of events, the thing which is done would not by itself alone be liable to produce injury and the resulting injury would not have happened except that someone else did something which the first person ought not reasonably to have expected he would do, then the latter thing is such a cause as prevents the former from being the proximate cause of the injury. If under this rule you shall believe that defendant did nothing which was the proximate cause of the collision, then your verdict must be for the defendant."

The court gave the following instruction on proximate cause: "The proximate cause of an injury is that cause which in a natural and continuous sequence, unbroken by any

new and independent cause, produces the injury, and without which it would not have occurred. You are therefore instructed that if you find from the evidence that the negligence, if any, of the defendant was the proximate cause of the injuries, if any, sustained by the plaintiff, your verdict must be in favor of the plaintiff."

Defendant's offered instruction was properly refused. Conceding, without deciding, that the instruction was not erroneous, notwithstanding that it covered merely acts of commission on the part of the defendant and did not embrace acts of omission, it was so involved as to be quite as likely to confuse as to enlighten the jury, and for that reason was properly refused. The instruction given on proximate cause states the law as repeatedly announced by this court (*Wallace* v. *Chicago, M. & St. P. Ry. Co.*, 48 Mont. 427, 138 Pac. 499; *Kirby* v. *Oregon Short Line R. R. Co.*, 59 Mont. 425, 197 Pac. 254; *Mize* v. *Rocky Mt. Bell Tel. Co.*, 38 Mont. 521, 129 Am. St. Rep. 659, 16 Ann. Cas. 1189, 100 Pac. 971; *Stroud* v. *Chicago etc. Ry. Co.*, 75 Mont. 384, 243 Pac. 1089; *McCloskey* v. *City of Butte*, 78 Mont. 180, 253 Pac. 267), and was sufficient on the subject.

The next contention of counsel for defendant is that his motion for a directed verdict should have been sustained on the ground of plaintiff's contributory negligence. Specifically he contends that under the evidence plaintiff knew that defendant was intoxicated when he left the Country Club and, therefore, that plaintiff took his own chances in riding with him. There is no direct evidence that he knew of the intoxication, if it existed. Defendant did not testify in his own behalf and neither did he offer any evidence to the effect that he was intoxicated. If he was intoxicated to plaintiff's knowledge, that fact must be ascertained from plaintiff's evidence. Careful reading of the evidence offered by plaintiff convinces us that it was for the jury to determine whether defendant was intoxicated at the time they left the Country Club and, if so, whether plaintiff knew it. The issue of contributory negligence was fairly submitted to the jury by the instructions and,

since the jury found for plaintiff on substantial evidence, its finding will not be disturbed.

The next contention of defendant is that the court erred in ██ receiving evidence, over his objection, of the cost of an annuity and in giving instructions on the subject. The particular point here urged is that there was not a proper foundation laid for the admission of such evidence. The evidence was introduced through the witness R. W. Miller, who for fifteen years had been an agent of the New York Life Insurance Company. Without objection he testified that plaintiff's expectancy of life, as shown by the American Mortality Tables, was 36.73 years; that the New York Life Insurance Company is a standard, old line company, and that it and other companies used the American Table of Mortality. He said he had the cost of purchasing straight annuities with his company, and that it is the rate book which he used for taking of applications for annuities, or any other type of insurance. He admitted that he was not familiar with the elements going to make up the cost of an annuity, other than the expectancy of life as determined by the mortality table, but that the cost of an annuity was found as part of the "American Table of Mortality."

The American Table of Mortality is a standard table, of the contents of which the courts will take judicial knowledge. (*Mug* v. *Ostendorf*, 49 Ind. App. 71, 96 N. E. 780; *Gordon* v. *Tweedy*, 74 Ala. 232, 49 Am. Rep. 813.) It being a standard table it was not necessary to make any further identification of it or to qualify the witness who gave its contents. (*Stephens* v. *Elliott*, 36 Mont. 92, 92 Pac. 45.) And the annuity tables which are a part of the mortality tables (*Marshall* v. *Marshall*, 252 Ill. 268, 96 N. E. 907), and so shown by the testimony of Miller, are subject to the same rules of admissibility. (*Borland* v. *Pacific Meat & Pack. Co.*, 153 Wash. 14, 279 Pac. 94.) The evidence complained of was properly admitted and the instructions on the subject were properly given.

If defendant were able to profit by evidence of the elements or factors used in computing the cost of an annuity, or if he

could show that other reliable companies sold annuities at a lesser cost, it was incumbent upon him to produce such evidence. This he did not do. True, the court instructed the jury as follows: "Annuity costs and mortality tables have been introduced in evidence in this case. Such tables are not to be considered as absolute basis for your calculations but must be used by you as a guide only so far as the facts before you correspond to those from which such tables were computed." The only objection made to the instruction was that there was no competent evidence before the jury of the cost of purchasing an annuity. There was no specific objection █ upon the ground now urged: that there was no evidence showing the facts from which the mortality table was computed. Under the circumstances defendant is in no position to question the propriety of the instruction or to complain that it covers a matter upon which there was no evidence, the contents of the table itself having been properly before the jury.

Error is predicated upon the admission in evidence, over defendant's objection, of two photographs taken about two years after the accident, exhibiting the highway at the place where the collision took place. One of them was taken with the camera 400 feet from the culvert towards Anaconda, and the other 300 feet therefrom in the same direction. Both pictures show the curve of the road and show an automobile standing beside the road at about the place where the wrecker stood. Evidence showed that between the time of the injury and the time the pictures were taken, the graveled shoulders of the road had been widened. The photographs were taken the same day that the engineer made plats. The plats were introduced without objection. The pavement was the same when the pictures were taken as when the accident occurred, and the general condition of the road was the same with the exception of the graveled shoulders, which was fully explained in the evidence. The general rule governing the admissibility of photographs is that they stand upon the same footing as a map or plat. (*Stokes* v. *Long,* 52 Mont. 470, 159 Pac. 28.)

And "it is not even necessary that the situation or condition should be precisely the same, but it is sufficient if the situation is substantially unchanged, and even the fact that there have been changes in conditions, will not necessarily exclude a photograph where the changes can be and are explained, so that the photograph, as explained, will give a correct understanding of the condition existing at the time to which the controversy relates." (22 C. J. 920.) It was not error to admit the photographs in evidence.

Error is assigned in giving the following instruction: "The ▉▉▉▉ statute laws of the state of Montana provide that at all turns, curves, corners and crossings, vehicles must slow down and be under complete control. You are therefore instructed that if you find from the evidence that the defendant violated this statute at the curve where this collision occurred, he was guilty of negligence as a matter of law." This is the law as declared in Chapter 80, Laws of 1927. The objection to the instruction was that there was no evidence that defendant knew, or should have known, that at the point where the collision took place there was such a curve as required slowing down and having his car under complete control, and that the statute imposes an unreasonable obligation upon drivers and for that reason is unenforceable.

As to the first of these objections it is sufficient to say that a person is presumed to see, and therefore know, that which he could see by keeping a lookout. (*Autio* v. *Miller*, ante, p. 150, 11 Pac. (2d) 1039.) Had he kept a lookout he would have seen the curve long before colliding with the wrecker. The obligation imposed by the statute is not an unreasonable one.

Defendant, in a proper case, would have the right to request an instruction defining the word "control" as used in the statute. There is no support in the evidence for such an instruction and no such instruction was offered. In *Carruthers* v. *Campbell*, 195 Iowa, 390, 28 A. L. R. 949, 192 N. W. 138, the court said: "The phrase 'having his car under control' does not necessarily mean ability to stop instanter under any and

all circumstances. Such a rule would be impossible of observance. A car is 'under control' within the meaning of the law if it is moving at such a rate, and the driver has the mechanism and power under such control, that it can be brought to a stop with a reasonable degree of celerity.'' Other cases defining the word ''control'' are cited in the exhaustive note in 28 A. L. R., commencing on page 952. We need not in this case attempt to define its meaning. In any event, whether there be proper control in a given case depends largely upon the speed of the car. The number of fatalities daily occurring establish the fact that a speeding automobile is a dangerous instrumentality regardless of the skill of the driver in steering it. Control and speed are so inseparably connected that it is doubtful whether the former could ever be said to exist when the speed is excessive. The test usually applied in determining whether a car is under control is the ability to avoid colliding with another who is using the highway and exercising proper care and caution on his own part. (See cases cited in note in 28 A. L. R., p. 958.) The statute complained of is valid and, as against the objection made to it, the instruction was properly given.

The next and final contention is that the verdict is excessive. In considering this question we keep in mind the well-established rule that in personal injury actions there is no fixed measuring stick by which to determine the amount of damages, other than the intelligence of the jury; that the jury is allowed a wide latitude, and unless it appears that the amount awarded is so grossly out of proportion to the injury as to shock the conscience, this court will not substitute its judgment for that of the jury, especially where, as here, the trial court has approved the verdict by denying the motion for a new trial. (*Sullivan* v. *City of Butte*, 87 Mont. 98, 285 Pac. 184; *Staff* v. *Montana Petroleum Co.*, 88 Mont. 145, 291 Pac. 1042; *Autio* v. *Miller*, supra.)

The evidence shows that at the time of the injury plaintiff was employed as a salesman by the Cellucotton Products Company, earning $360 per month, which consisted of $150 straight

salary, $60 per month bonus, conditioned upon his working out a twelve-months period, and $150 per month for living expenses. He was also given an allowance for expenses in running an automobile. He expended $3,570 for medical and hospital expenses as a result of the injuries. From the time of the injury until the time of the trial (nearly three years) he had been totally incapacitated from performing any work. Both bones in his left leg were broken as the result of the collision. To bring about a partial cure it was necessary to effect a bone graft. He suffered excruciating pain for months while his leg was undergoing treatment in the hospital. There is a permanent disability in that the injured leg is shorter than the other and the muscles are smaller, and there is no free movement of the ankle joint. As a result the injured leg is much weaker than the other. There is evidence that in consequence plaintiff will not be able to carry on his previous occupation but must accept a less strenuous one. There is evidence that his future earning capacity will be limited to $150 per month. His actual loss of earnings for the three years elapsing from the time of the injury to the time of the trial amounted to more than $12,000. When to this is added the $3,570 medical and hospital expense, the remainder of the verdict is easily accounted for in the way of reasonable compensation for pain and suffering and loss of future earnings. We cannot say that the amount of the verdict indicates passion and prejudice on the part of the jury.

Plaintiff filed a supplemental transcript on appeal showing, among other things, the verdict of the jury upon a former trial of this cause. In his brief he makes reference to this verdict and quotes from what purports to be the testimony of defendant Berger in the former trial, but which was not introduced in this trial. Defendant filed a motion to strike the entire brief, or if that be not proper, then in the alternative, that certain pages of the brief wherein reference is made to these matters be stricken therefrom. The matter complained of, not being part of the record of the trial resulting in the judgment appealed from, is not properly before us. The motion to strike

those portions of the brief is sustained, but the motion to strike the entire brief is denied.

No error appearing, the judgment is affirmed.

MR. CHIEF JUSTICE CALLAWAY, MR. JUSTICE MATTHEWS, HONORABLE JEREMIAH J. LYNCH and HONORABLE JOHN HURLY, District Judges, sitting, respectively, in place of JUSTICES GALEN and FORD, disqualified, concur.