20 N.J. Super. 180 (1952)
89 A.2d 476
LIZETTA PETRONE, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF ALBERT PETRONE, DECEASED, PLAINTIFF-APPELLANT,
v.
RONALD MARGOLIS, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 2, 1952.
Decided June 17, 1952.
*182 Before Judges McGEEHAN, JAYNE and GOLDMANN.
Mr. William Furst argued the cause for appellant (Mr. Manuel L. Barrett, on the brief).
Mr. Arthur J. Blake argued the cause for respondent (Messrs. Markley & Broadhurst, attorneys; Mr. Edward A. Markley, of counsel).
The opinion of the court was delivered by JAYNE, J.A.D.
The mishap out of which the present litigation has arisen was the occurrence of a collision of an automobile owned by the defendant with a utility pole at or near No. 22 Broadway in the City of Newark at about 1:30 A.M. on May 25, 1950. The vehicle was admittedly owned and probably being operated at the time by the defendant. The plaintiff's intestate was an invited passenger in the car, who sustained a bodily injury in the collision from which he died on May 26, 1950. The plaintiff prosecuted this action against the defendant for the recovery of compensatory damages in her respective representative capacities as general *183 administratrix of the decedent's estate and as administratrix ad prosequendum. R.S. 2:47-1 et seq.
The members of the jury rendered a verdict specifically expressive of their conclusions, viz., "(a) the deceased guilty of contributory negligence; (b) in favor of defendant, no cause for action; (c) verdict unanimous." The application to the trial court for a new trial was denied, and the plaintiff now appeals from the final judgment and from the order dismissing the motion for a new trial.
It is immediately realized that the only contributory negligence of which the decedent could reasonably be said to have been guilty was his imprudent assumption, voluntarily, knowingly, of the risk of riding in a motor vehicle operated by a driver who was under the influence of intoxicating liquor.
As we view the case, the paramount inquiry is whether there was evidence from which it could have been logically and legitimately inferred that at the time the decedent entered the vehicle or within a reasonable period prior thereto, the defendant was in such a state of intoxication to induce a person of ordinary caution, circumspection and foresight to conclude that the defendant was unfit to operate the vehicle with reasonable care and safety to a passenger.
The inaugural comment may be that it is not in all instances to be inferred that the visitor upon departure is necessarily in a state of incapacitating intoxication merely because he has remained for a span of time in a saloon, a popular democratic meeting house for the dissemination of common information, or in a sumptuously ornamented cocktail lounge, wherein the subjects of income taxation, Mexican divorces, and philosophy are obliquely discussed. Some temporate patrons seem to enjoy primarily the atmosphere of contagious relaxation even though it is permeated with the thick clouds of cigarette smoke.
Nor is it always rational to measure the degree of the mental and physical impotency of the drinker merely by an observance of his loquacity, his vocal intonations, or the vigor of his argumentative discourse. Concededly, they are factors, *184 but they need corroborative associates. Not infrequently is it said of an intemperate consumer of alcoholic beverages that while imbibing he customarily assumes an attitude of concentrated piety, whereas in contrast some temperate tavern haunter immediately places his larnyx in high gear and brandishes the muddler or, indeed, the half-filled glass about his head like a silver scimitar.
The foregoing comments, which are gleaned from the field of common knowledge, are not irrelevant to the consideration of the evidence in the present case.
The proof is ample to justify the conclusion that the defendant left his home at about 9:30 P.M. on the evening immediately preceding the mishap and visited a gas station for gasoline for his car, a drugstore for an article for his wife, a liquor store for a case of beer to take home, and a tavern next door to the drugstore for a glass of beer. He thereafter entered at 10:00 P.M. a nearby tavern known as "Maurice's Palm Garden," from which he and the decedent departed for their respective homes in the defendant's automobile at about 1:00 A.M.
There was no testimony whatever descriptive of the manner in which the collision occurred. The plaintiff succumbed, and the injury to the head of the defendant is said to have resulted in his complete loss of memory of all of his activities which followed his purchases at the drug and liquor stores. That the defendant and the decedent were together at Maurice's tavern for a sufficient period of time and in such circumstances as to afford the decedent the opportunity to observe the condition of the defendant is not to be doubted.
We search the transcription of the testimony to ascertain what manifestations of incapacitating intoxication the defendant exhibited.
Quotations from the transcript will disclose the literal aspects of the pertinent testimony.
The witness Wacker testified:
"Q. This fellow, Margolis, he was kind of noisy, was he not? A. Yes.
*185 Q. And boisterous? A. Yes.
Q. And obviously had been drinking too much at that time, had he not?

* * * * * * * *
A. Yes.
Q. And, as a matter of fact, Petrone was drinking also, isn't that so? A. Yes.
Q. And his voice was very heavy, not like his normal voice, isn't that so? A. Yes, he was drinking.
Q. His voice was very heavy and not like his normal voice, isn't that so? A. Yes.
Q. Wouldn't you say that both Mr. Margolis and Mr. Petrone were both feeling pretty good? A. Yes, they were drinking.
Q. Just answer that question. Would you say that they were bordering on intoxication? A. They were both drinking.
Q. Were both, in your opinion, from your observation, bordering on intoxication? A. Well, they were drinking.
Q. Can't you answer that question? A. What do you mean by bordering?
Q. When they walked out, did they stagger out? A. No.
Q. Did Mr. Margolis stagger? A. No.
Q. Are you sure of that? A. Yes.
Q. They were together for over an hour, is that your opinion? A. A little over an hour, yes.
Q. And during that time, were they arguing back and forth? A. Yes.
Q. During that time, they were constantly drinking, is that correct? A. Well, I was playing pinochle and I wasn't  I couldn't say that they were constantly drinking.
Q. Every time you looked, did they have a drink in front of them? A. I would say so.
Q. Did you notice during the time that you recognized them for this period of at least an hour that their condition changed as they sat there or did they remain exactly the same as they were before? A. That, I couldn't say.
Q. You wouldn't want to say one way or the other? A. How I remembered so clearly is the fact that this Margolis was very loud and boisterous, he was talking about the war.
Q. Did you think Margolis was intoxicated? A. Well, he was drinking.
Q. Did you think Margolis was intoxicated? A. No.
Q. You didn't think he was intoxicated? A. No.
Q. Did you think he was close to it? A. I would say close to it."
The bartender at the Maurice tavern imparted the following information:
"Q. Were they seated at your bar? A. Mr. Margolis was seated at the bar before Mr. Petrone came in and Mr. Petrone was just *186 standing, leaning up against the shuffleboard and they weren't together, they didn't seem to know each other.
Q. Did you see them in conversation at any time that evening? A. Yes, I did.
Q. About what time, do you remember? A. Oh, I would say around about 15 or 20 minutes after Mr. Petrone came in; I would say after 12 o'clock.
Q. Did you see them leave? A. I did.
Q. And did they leave together? A. They walked out of the place together.
Q. They walked out together? A. They did.
Q. You had an opportunity, did you not, to serve both these men? A. I did.
Q. During the course of the evening? A. I did.
Q. Do you recall what they were drinking? A. They were both drinking beer.
Q. Do you remember their condition when they left? A. To my knowledge, they were both capable of taking care of themselves very well.
Q. And they walked out? A. They walked out.

* * * * * * * *
Q. Well, would you say whether it was loud for Maurice's Palm Gardens or not, that Margolis was loud when he was talking with Petrone? A. He was a little extra loud than the rest of the people in the place.
Q. And he had been sitting in your place for a couple of hours before Petrone came along? A. That is right.
Q. And he and Petrone were talking for maybe 15 minutes or so and then, they both went out together? A. Fifteen minutes, I would say."
The witness Koehler furnished this account of his observations:
"Q. Did you notice him talking to Margolis before that? A. Yes, they were sitting right alongside of each other, and they were talking, discussing something.
Q. Was Margolis intoxicated? A. He was drinking.
Q. Was he intoxicated? A. I don't know whether he was intoxicated.
Q. Did you see him walk around? A. As far as I know, I didn't see him get up off the stool while I was there."
The only other witness of those present in the tavern was McGlynn, from whose testimony the following quotations are taken:
*187 "Q. What was the condition of Margolis when he left, insofar as his soberness was concerned? A. To my impression they seemed to be all right when they left the place.
Q. What? A. They seemed to be all right in walking out.
Q. Did you see him drinking while you were there? A. Yes, I did.

* * * * * * * *
Q. How did Al appear to be? A. He appeared to be all right.
Q. How did the other fellow appear to you, Mr. McGlynn, truthfully?

* * * * * * * *
A. He didn't appear to be too good.

* * * * * * * *
Q. What is your impression of Mr. Margolis' condition when you saw him on that night? Was he near to being drunk, or not? A. No, he wasn't.
Q. Had he been drinking? A. He was.
Q. Was he drinking more and was he in worse condition than Al on that night?
Mr. Furst: I object.
The Court: I will sustain the objection.
Q. In your opinion, did both of them appear to be a little high?
Mr. Furst: I object to it. He is not a qualified expert.
The Court: I will sustain the objection.
Mr. Blake: I would like an opportunity to impeach this witness.
The Court: Proceed.
Q. Do you remember signing a statement for Officer Forsythe of the Department of Public Safety? A. Yes, I do.

* * * * * * * *
Q. Regardless of the time, did you tell Officer Forsythe that both of them were a little high when they left? Answer yes or no. A. I did.
Q. That's true? A. Yes.
Q. So the only thing that isn't true is the time? A. The time, that's right.
Q. But both were a little high when they left? A. Yes, they were, to my estimation."
The witness Krauss saw the decedent and the defendant depart from the tavern. Said he:
"Q. Did you see the automobile go away? A. Yes, it went away like a shot."
A determination that the defendant was negligent in the operation of the vehicle seems to be implicit in the composition of the verdict expressed by the jury. Compare, incidentally, Smith v. Kirby, 115 N.J.L. 225 (E. & A. 1935); *188 Spill v. Stoeckert, 125 N.J.L. 382 (E. & A. 1940). Naturally the factual issue of the primary negligence of the defendant is not implicated in the plaintiff's appeal.
The suggestion that the decedent had himself so overindulged that he could not have intelligently appreciated the state of intoxication of the defendant even though it might have been perceptible carries no legal significance. Where one, by reason of his own voluntary overindulgence in intoxicating liquors, exposes himself to manifest danger and sustains bodily injuries which he otherwise could, and by the exercise of ordinary foresight and prudence, would have avoided if sober, such a person is guilty of contributory negligence which bars a recovery of damages from another for the injuries to the cause of which his own carelessness proximately contributed. Bageard v. Consolidated Traction Co., 64 N.J.L. 316 (E. & A. 1900); Hoppock v. Easton Transit Co., 77 N.J.L. 342, 343 (Sup. Ct. 1909). However, carelessness is not to be necessarily inferred merely from proof of the existence of a state of intoxication. "A drunken man may be careful." Bageard v. Consolidated Traction Co., supra.
The jury in the present case in finding "the deceased guilty of contributory negligence" evidently resolved that the decedent in entering the vehicle to be operated by the defendant for transportation over the public highways voluntarily assumed a known risk. It has been often stated that there is a difference between being subjected to an unforeseen peril and being overtaken by one recklessly incurred. The difference inheres in the general rule expressed in the maxim volenti non fit injuria, which denies a recovery to one who in a proximate degree has consciously made himself an instrumentality or target of his own injury.
However, the mere circumstance that the jury denominated the dereliction of the decedent as contributory negligence instead of assumption of risk is not an incident of critical importance. It may be conceded that there is a distinction between those legal concepts. Seaboard Air Line v. Horton, 233 U.S. 492, 504, 34 S.Ct. 635, 58 L.Ed. 1062 *189 (1914); Cetola v. Lehigh Valley R.R. Co., 89 N.J.L. 691 (E. & A. 1916); concurring opinion of Mr. Justice Heher in Harenburg v. August, 119 N.J.L. 83, 87 (E. & A. 1937); Campbell v. The Pure Oil Co., 15 N.J. Misc. 723, 728 (Sup. Ct. 1937). Nevertheless our Supreme Court has recently stated that the two "concepts are virtually identical." White v. Ellison Realty Corp., 5 N.J. 228, 235 (1950). Certainly the tendency of the reported cases since the disappearance of the common law litigation between masters and servants is to treat assumption of risk in its general sense and contributory negligence as convertible terms. Here the apparent intent of the jury in its verdict was to explain, not to classify.
And so we return to the consideration of the conduct of the decedent in the light of all the surrounding circumstances disclosed by the evidence. Assuredly the decedent was obliged to exercise a degree of care for his own safety commensurate with the known risk. Card v. Carrigan, 137 N.J.L. 722 (E. & A. 1948). "One's right to protection from the negligence of others carries with it the duty of reasonable care for one's own safety." Milstrey v. Hackensack, 6 N.J. 400, 414 (1951).
Hence the test was whether an ordinarily cautious and prudent person would, under the same or similar circumstances, have incurred the risk of riding with the defendant. Solomon v. Finer, 115 N.J.L. 404 (Sup. Ct. 1935); Goldstein v. Hotel Altman, 4 N.J. Super. 78 (App. Div. 1949). See, Restatement, Torts, sec. 466, comment (e); 4 Blashfield's Cyc. Auto Law and Prac. 602, sec. 2453; 5 Am. Jur. 774, sec. 483.
Whether or not such a person knows or in the exercise of reasonable vigilance should have known that the driver lacked the capacity safely to operate the vehicle is a question of fact. So also the causal relationship in a proximate contributory sense of the danger voluntarily assumed to the production of the injuries sustained is normally a question of fact, and where fair-minded men might honestly differ in *190 the appraisement of the accompanying circumstances, knowledge, and conduct of the passenger, the question is one for the jury.
The reported cases in other jurisdictions concerning the assumption of a risk of this nature are now numerous. The following are in general expressive of the judicial point of view that such an issue is characteristically one for the determination of the triers of the facts. Tomlinson v. Kiramidjian, 133 Cal. App. 418, 24 P.2d 559 (Cal. Dist. Ct. App. 1933); Wise v. Stagg, 94 Mont. 321, 22 P.2d 308, 310 (Mont. Sup. Ct. 1933); McMahon v. Schindler, 38 Cal. App.2d 642, 102 P.2d 378, 381 (Cal. Dist. Ct. App. 1940); O'Connell v. McKeown, 270 Mass. 432, 170 N.E. 402, 403 (Mass. Sup. Jud. Ct. 1930); State ex rel Oliver Iron Mining Co. v. Armson, 181 Minn. 221, 232 N.W. 35, 40 (Minn. Sup. Ct. 1930); McNair v. Berger, 92 Mont. 441, 15 P.2d 834 (Mont. Sup. Ct. 1932); Wold v. Gardner, 159 Wash. 665, 294 P. 574 (Wash. Sup. Ct. 1930); Mann v. Harmon, 62 Ga. App. 231, 8 S.E.2d 549 (Ga. Ct. App. 1940).
In the studious examination of the evidence adduced in the present case it may be acknowledged that, if separated into parts relating only to one individualized element of the principle of assumption of risk, each part of the testimony is frail, but it is an efficient practice to gather, as we presume the jury did, all of the fragments and to them ascertain whether or not the detached portions of the evidence when brought in contact form a rather complete revelation of the factual situation.
There was evidence leading the jury to believe that the defendant had visited a tavern before he arrived at that of Maurice, where he was conspicuously "noisy and boisterous," and described to have been "close to" intoxication, "a little high," "didn't appear to be too good," and "obviously had been drinking too much." The decedent and the defendant were "sitting right alongside each other" and were drinking beer and conversing. In driving away at about 1:00 A.M., the automobile "went away like a shot," and in *191 only a few minutes the vehicle came into collision with a pole outside the public street.
Therefore having due regard to the opportunity of the jury and the trial court to pass upon the credibility of the witnesses and the import of the testimony, we are unable to conclude that it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice, or passion. Rules 1:2-20; 4:2-6.
Judgment accordingly affirmed.