ROBERT W. CALLIHAN, Plaintiff and Respondent v. GREAT NORTHERN RAILWAY COMPANY, Defendant and Appellant.

No. 9935.
Submitted December 3, 1959. Decided March 18, 1960.
Rehearing Denied April 6, 1960.
350 Pac. (2d) 369.

94

Weir, Gough, Booth & Burke, Helena, for appellant. Edwin S. Booth argued orally.

Maury, Shone & Sullivan, Butte, Walter T. Murphy, Superior, for respondent. A. G. Shone argued orally.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment for plaintiff in an action to recover damages under the Federal Employers' Liability Act (45 U.S.C.A. §§ 51 to 59) for personal injuries allegedly suffered by plaintiff who was thrown from a bunk while sleeping in a caboose when a train was brought to a sudden stop because of an apparent emergency situation. A jury verdict was in the amount of $51,000.

The plaintiff, respondent here, will be referred to simply as plaintiff, and the defendant Railway Company, appellant here, will be referred to as defendant.

The pleadings show the action to be one under the Federal Employers' Liability Act; that the defendant is a corporation, a common carrier by railroad; that defendant at the time plaintiff was injured was engaged in interstate commerce; that plaintiff was an employee of defendant at the time of the injuries; that plaintiff was in the course and scope of his employment at the time of the injury; and that an employee of defendant, acting within the scope and course of his employment, at the rear of the train, because of an apparent emergency, pulled the emergency air-brake lever.

The allegations of fact concerning the incident, and the claimed negligence as set forth in the complaint, are that the train took a siding at Toole, Montana; that when the train left the siding with the cars closely bunched, "the conductor at the rear of the train carelessly and negligently pulled the emergency air-brake lever or valve, releasing the air from the air brakes causing the brakes in each train car to become suddenly and firmly set * * * said conductor at said time believing that there

was an emergency existing requiring the application of the emergency air brakes.''

Plaintiff alleged that no such emergency actually existed at said time and place; that the air brakes were applied unnecessarily without giving the plaintiff any warning, and the train and car in which plaintiff was riding negligently came to an unscheduled, unnecessary and extraordinarily sudden, violent and unusual stop of unusual severity which threw plaintiff from the bunk on which he was sleeping. Specific allegations of negligence were:

(1) That the conductor was negligent in applying emergency air brakes and bringing the train to a sudden stop;

(2) That defendant was negligent in placing the caboose or car in which plaintiff was riding behind the engine and ahead of 80 freight cars;

(3) That the defendant failed to use reasonable care in providing plaintiff a reasonably safe place to work;

(4) That defendant failed to establish and promulgate rules for the safe conduct of a dangerous movement. The balance of the complaint relates to the alleged injuries and damages.

The answer admitted that plaintiff was deadheading from Helena to Paradise; that he was in the course of his employment during the deadheading; that the train was required to take the siding at Toole, and that ''an employee of defendant, acting within the scope of his employment at the rear of the train pulled the emergency air brake or valve, said employee believing at said time that there was an emergency existing requiring the application of the emergency air brakes.''

There was a general denial as to the other matters alleged in the complaint contained in the answer. The answer also pleaded contributory negligence of the plaintiff which was denied by the reply.

The testimony, as to the negligence alleged, was that during May 1954, the Great Northern Railway tracks were impassible because of flood conditions in Idaho and Western Montana, and

because of this it was necessary to route Great Northern trains over the tracks of the Northern Pacific Railway Company between Sand Point, Idaho and Helena, Montana. The same condition had existed in prior flooding in 1948 and the same detour route and method of operation were used. The time for passage over the Northern Pacific tracks exceeded the hours one crew could work, making it necessary to "double crew" or put two Great Northern train crews on each freight train. One crew would work part of the distance and then the other crew would work, the crews being designated as "deadhead" and "working crews". A Northern Pacific pilot engineer and conductor were likewise required while operating on that Company's tracks. The usual make-up of these freight trains on this detour was to put a caboose at each end of the train. The location of the caboose, immediately behind the engine, was testified to as being for the convenience of the crews as well as that of the Company. The crew in charge of the train at the time would use the caboose in the rear of the train as the working caboose, while the caboose at the head-end was used by the "deadhead" crew to rest and sleep. This practice was followed during the operation over the Northern Pacific tracks during the flood period in 1948 and 1954.

The plaintiff made only one round trip from Spokane, Washington, to Helena, Montana, on this detour movement. The eastbound trip left Spokane on May 21, 1954. One crew, designated as "Spokane crew" including plaintiff as fireman, operated the train to Paradise, Montana; and then deadheaded to Helena, Montana. The second crew designated as the "Whitefish crew" deadheaded to Paradise, and operated the train to Helena, Montana. On this particular east-bound trip a stock coach (an old passenger coach) was used for the deadhead crew and was located at the rear of the train just ahead of the caboose.

The two crews were called for the return west-bound trip from Helena to Spokane on May 23, 1954. The Whitefish crew was to operate the train out of Helena to Paradise. The Spo-

kane crew deadheaded to Paradise and then took over the train operation to Spokane, Washington. When the crews arrived at the Helena yard, the train was made up with one caboose at the head-end directly behind the engine and one at the rear of the train. The head-end caboose was for the deadhead crew while the conductor and rear brakeman used the rear caboose as the working caboose. There are four bunks or settees in the caboose so that plaintiff, the conductor, engineer and head brakeman, on the deadhead crew, occupied the caboose at the head-end, while the deadhead crew's rear brakeman, one Pardee, was in the working caboose.

The train proceeded westward to Toole, Montana, a siding about seventeen miles east of Paradise, Montana, where it went onto a siding to permit an east-bound train to pass. The train was on the Toole siding about 6:00 a. m. on May 24, 1954. At that time the members of the crew in the deadhead caboose were sleeping on bunks in the caboose, plaintiff being in a sleeping bag with his feet toward the rear of the train with the outside of his bunk raised about three or four inches. The other three occupants were sleeping with their feet toward the engine. As the train was pulling out of the siding at a slow speed, the air brakes were applied from the rear end of the train which resulted in the sudden stop of the deadhead caboose. Plaintiff was thrown from the bunk and struck his head and shoulders against the wall and floor.

Hedman, the deadhead conductor, was in the same caboose with plaintiff Callihan. He was awakened by the sudden stop and slid forward into the bunk that plaintiff had been thrown out of. It was a hard stop. Hedman picked plaintiff up, who complained of being hurt.

The deadhead crew, including plaintiff, all being asleep were not able to testify as to what happened to cause the severe sudden stop. But as the pleadings show, the emergency application of air brakes on the rear end was made because it was

believed "that there was an emergency existing that required the application of the emergency air brakes."

The conductor Knight testified that as the train was pulling out of the siding, that he, and the pilot conductor, and one Doyle, a brakeman, observed dust and dirt flying from under a car some distance ahead of the rear caboose but they were unable to tell what was causing it. They were concerned that whatever it was would tear out the switch. Knight called on Doyle to apply the air, and as he (Knight) thought the train was not stopping fast enough to stop the train before such car would reach the switch Knight called to "dump her", or apply the emergency air, which was done. The car from which the dirt was flying stopped three or four cars short of the switch. Doyle testified to the same general effect as Knight, and, in addition, testified that when he started to apply the air, he followed the instructions to apply the air in the first notch for a certain time and then in the next notch; that by doing this he believed he had the train about half stretched out when he was told to "dump her". Both of them testified that the emergency application was necessary to stop this car before it reached the switch. After stopping and investigating they found a dead elk caught beneath the car in the center of the track which had caused the dust to raise. The stop on the rear caboose was not unusual according to them.

All of the witnesses for the defendant testified that the action taken, by conductor Knight and brakeman Doyle, was proper action under the conditions known to them to have existed at the time and place when the stop was made.

Plaintiff offered evidence, over objection, to show that the caboose in which he was riding at the head-end of the train was in violation of a rule, contrary to custom and an unsafe place to work. The plaintiff and one Frauendorfer testified, over objection, that *an outfit car was any car equipped to handle men in transit and having a stove and bunks. They considered the caboose for the deadhead crew as an outfit car.*

Rule 801, Consolidated Code of Operating Rules, was received in evidence as Exhibit 1, over objections, which will be touched upon later, and both witnesses stated they considered the caboose at the head-end of the train as contrary to the rule. These witnesses testified that the custom was to put the caboose at the rear end of the train and were permitted to testify as to possible danger with the caboose at the head-end of the train. Plaintiff was not familiar with other movements over this detour route in either 1948 or in 1954, and neither was Frauendorfer.

Plaintiff and Frauendorfer each stated that if an outfit car were located any place other than at the rear of the train he would complain to the yardmaster. Plaintiff did not complain to anyone as to the location of the caboose at the head end, although he claimed to be familiar with Rule 801 at the time.

There is no rule covering the location of a caboose, as such, in a train. A caboose, of the type used here, being an all steel one, may be placed safely anywhere in the train according to the defendant's witnesses. "Outfit cars" as covered by Rule 801, were defined by the defendant's witnesses and each of them stated that a caboose is not an outfit car and was not covered by that rule. The rules themselves do not define an outfit car except as in Rule 801 hereinafter set out. The testimony was to the effect that while the caboose for the working crew was usually on the rear because that is where the rear end crew is required to be, cabooses on work trains are frequently handled next to the engine. Cabooses of this type are strong enough to be pushed with helper engines. The defendant's witnesses testified that the caboose behind the engine would be easier riding than on the rear end, when under the normal operation of a freight train the braking is done from the engine. It is usually only in emergency situations, such as the apparent one encountered here, that an emergency application of the brakes would be handled from the rear caboose.

The defendant specifies some eighteen specifications of error which he groups in his argument as relating to the same matters.

Specification of error 6 is directed to the court's refusal to grant a nonsuit to defendant while specification of error 7 is directed to the refusal of the court to grant defendant's motion for directed verdict.

The complaint alleges specific acts of negligence as previously set out. No evidence was offered as to the alleged negligence of the conductor in applying the emergency brakes. There was no evidence that plaintiff was riding in a passenger coach car or that the company negligently failed to establish rules. This leaves for consideration by the court only the alleged negligence of failing to use reasonable care to furnish a safe place to work, and the alleged negligence of placing the car in which plaintiff was riding or sleeping behind the engine and ahead of 80 freight cars.

Evidence in support of these alleged acts of negligence consisted of: (1) introduction of plaintiff's Exhibit 1, which is Rule 801; (2) the testimony as to the applicability of the Rule; (3) the testimony as to custom and usage; and (4) the testimony as to the speculative danger as to a caboose located behind the engine.

The plaintiff admitted there was normal slack action in regular freight train operation and that had be been in a caboose at the rear of the train, he would have wanted to sleep with his feet toward the engine on account of such slack action. The pleadings admitted that the application of emergency air from the rear end of the train was because of an apparent and believed emergency situation and not by reason of any negligence either in a normal or an emergency condition.

We shall attempt briefly to analyze the recent cases of the Federal Courts, particularly of the United States Supreme Court as to the law of negligence under the Federal Employers' Liability Act. Beginning with our own case Leonidas v. Great Northern R. Co., 105 Mont. 302, 72 P.2d 1007, affirmed

305 U.S. 1, 59 S.Ct. 51, 83 L.Ed. 3, and going on to the recent case of Rogers v. Missouri Pacific R. Co., 1957, 352 U.S. 500, 506, 507, 77 S.Ct. 443, 449, 1 L.Ed.2d 493, the United States Supreme Court said with reference to the Federal Employers' Liability Act:

"Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even in the slightest, in producing the injury or death for which damages are sought. * * * Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death."

And, in New York, New Haven & Hartford R. Co. v. Henagan, 1 Cir., 1959, 272 F.2d 153, 156, the court had this to say:

"The test is simply and easily stated. The trouble comes in applying it, for what may be entirely reasonable to one person may be utterly unreasonable to another. The Supreme Court of the United States, of course, has the final say in these cases as to what is or is not a reasonable conclusion to draw from the evidence. And we recognize that in recent years the Supreme Court has allowed juries great latitude in deciding what may or may not be a reasonable conclusion to draw from the evidence in cases under the Federal Employers' Liability Act. We do not, however, read the Court's recent decisions as depriving trial judges in cases like this of their historic function of exercising a preliminary judgment on the facts to determine whether the plaintiff has shown enough to warrant a fair-minded jury in returning a verdict in his favor. New York, New Haven & Hartford R. Co. v. Dox, 1 Cir., 1957, 249 F.2d 572, 573, 574."

And in Herdman v. Pennsylvania R. Co., 1957, 352 U.S. 518, 77 S.Ct. 455, 1 L.Ed.2d 508, the same author, Mr. Justice Bren-

nan on the same day as the Rogers v. Missouri Pacific R. Co. case was decided, stated that the emergency application of brakes is not negligence in and of itself, and seemed to say that it is still required under the Federal Employers' Liability Act, § 51, that there must be some negligence, even though slight, for the question of negligence to be permitted to go to the jury.

Professor Warren A. Seavey, writing in the 1958 Annual Survey of American Law published by New York University School of Law, page 500, said: ''For some time it has been recognized that by judicial decision, railroads, * * * are insurers of the safety of their employees. Current cases have made this more manifest.''

The New York, New Haven & Hartford R. Co. v. Henagan case, supra, certainly bears out Professor Seavey's statement, but we are not prone to go beyond what the Rogers and Herdman decisions lay down as the criteria for negligence under the Federal Employers' Liability Act. We believe it is our duty to see that some substantial evidence of negligence, even though slight, is presented under recognized rules of evidence before a prima facie case can be submitted to a jury. Otherwise, conjecture, sympathy, and even outright fraud will allow lay juries to take over abdicated judicial processes.

We think, then, that under even the most stringent Federal case rulings, excluding that of the previously partially quoted New York, New Haven & Hartford R. Co. v. Henagan case, supra, that some slight evidence of negligence must be involved before a case may go to the jury. From the previously set out testimony of both the plaintiff and defendant, we think there was some slight evidence of negligence, sufficient to go to the jury, taking it in the light most favorable to the plaintiff on motions for directed verdict, and nonsuit, and therefore hold the trial court not in error in refusing to grant the motions.

Rule 801, about which the next three alleged errors revolved reads as follows:

''801. Before coupling to or moving occupied outfit

cars, notice must first be given all occupants, and all ladders and other equipment cleared before moving.

"Occupied outfit cars should be handled immediately ahead of caboose when practicable. Women or children will not be permitted to ride in such cars unless authorized by the superintendent.

"When occupied outfit cars are set out or taken into yards in trains, the train dispatcher and the yardmaster must be promptly notified. When practicable, occupied outfit cars should not be placed adjacent to or in buildings or structures.

"Sidings blocked by occupied outfit cars should not be used for meeting or passing trains if it can be avoided."

It is immediately seen from reading the Rule that a caboose and an outfit car are not necessarily synonymous. Neither term is specifically defined. It was testified to by witnesses for both the plaintiff and defendant that generally an outfit car is a car modified so as to provide living facilities for crews, gangs or outfits. It is usually numbered and prefixed in the number by the letter "O". However, the plaintiff and his witness Frauendorfer were allowed to testify that a caboose used for a deadhead crew was an outfit car. In other words, that the "use" changed a caboose to an outfit car. The defendant, in its brief in response to this argues that, "An oil barrel in a boxcar does not make it a tank car and a bunk in a caboose does not make it an outfit car."

It is noted that the Rule itself as to location says "when practicable". Since both the definitions and the inclusion of "outfit car" in Rule 801 is not defined, and the rule itself says "when practicable", the district court left to the jury the entire question as to Rule 801 as will be demonstrated.

Of the three alleged errors previously mentioned, specification of error No. 1, relates to the receipt in evidence of Rule 801, as to "outfit cars".

Specification of error No. 2 is to the effect that receipt in

evidence, over the objection, that a caboose "used for deadhead crews" was an "outfit car" within the meaning of Rule 801 was error.

Specification of error No. 10 concerns the giving of Instruction No. 32(b) as follows:

"You are instructed that Rule 801 of the company's rules was solely admitted in evidence in this case so that you can consider from a preponderance of all the evidence whether or not a violation of said rule was or was not negligence."

First of all, the appellant contends that he had a continuing objection to the receipt in evidence of Rule 801, and to the receipt in evidence concerning whether or not a caboose was an outfit car. The respondent contends however that the appellant waived his objection to both of these matters when, on an exchange between counsel before the trial judge, the plaintiff was attempting to offer one sentence of Rule 801, the following exchange was had:

"Mr. Shone: We offer in evidence, may it please the Court, that portion of Rule 801, and I will show counsel what I refer to. It's just the one sentence.

"Mr. Booth: We will ask for the entire rule to be put in.

"Mr. Shone: All right, we will put the entire rule in.

"Mr. Booth: Rule 801.

"The Court: Admitted. I understand now the whole Rule 801 is admitted in evidence.

"Mr. Booth: That's right. You asked that the rule be put in.

"Mr. Booth: However, our objection still stands as to materiality of the rule.

"Mr. Shone: Counsel said he wants the whole rule put in, and that was his remark, and I said all right; and Your Honor said the rule is admitted.

"Mr. Booth: We are not waiving our objection to the rule.

"Mr. Shone: We will let the record show that.

"Mr. Booth: What I meant was that I objected to the materiality.

"The Court: What you meant was that you objected to that one portion of the Rule 801 which he wanted to offer in evidence, didn't you? That is your objection?

"Mr. Booth: We object to the entire rule, if it please your Honor; but if it is admitted, then we ask for the entire rule.

"The Court: I understand. In other words, if the Court admits in evidence that part of Rule 801 which he offered in the first place, then you want all of 801 in evidence.

"Mr. Booth: That's correct, Your Honor.

"The Court: Very well.

"Mr. Shone: The particular rule that the witness is referring to, I will read the particular portion of the rule first, and then the whole one. The particular portion of Rule 801 of the Consolidated Code of Operating Rules and General Instructions is as follows: * * *

"Q. Have you been guided by that rule ever since you have been a fireman and engineer? A. I believe that rule has been in force since I have been here.

"Mr. Shone: Your Honor, as we have read the rule into evidence, I would like to return the rules book, is that satisfactory?

"The Court: Very well.

"Mr. Booth: I think that I will ask for the entire book to be put in evidence, if it please Your Honor, for the reason that our very objection goes to the fact that other parts of the rules may be necessary to determine the basis of the objection, namely, the definition of a caboose is in there, and so forth.

"The Court: Well, why not offer in evidence the part that you wish in evidence. That will simplify matters.

"Mr. Booth: We ask for the exhibit. The book is an exhibit.

"The Court: Have you any objection to the whole book going into evidence?

"Mr. Shone: That would encumber the record, to put the whole book in. I would have to put in all these rules, and there are over 800 of them.

"Mr. Booth: The exhibit in evidence can be certified.

"Mr. Shone: I will leave it in evidence. If we make a copy of the rule, would that be satisfactory? A typewritten copy? Will you put your rule in? Have you got a rule book?

"Mr. Booth: You offered the exhibit. You leave it in evidence.

"Mr. Shone: Have you got an extra rule book?

"Mr. Burke: No, we haven't.

"The Court: The court rules that Rule No. 801 is offered in evidence and received in evidence. Now, the defendant railroad company can make their offer at any time to offer any other portions of this book in evidence. The Court will rule on the offer at that time."

It is the appellant's contention that the quoted instruction, which was given to the jury during the course of the trial at least twice, and given to the jury at the end of the trial *was a direct comment on the evidence* and therefore prejudicial. Appellant contends in this connection that the trial judge has said that the defendant *did violate* Rule 801, and that a caboose used for deadheading crews *was an outfit car* under the Rule and that the only thing left for the jury was whether or not the violation of the Rule was or was not negligence.

It is noteworthy that no instruction was offered by the defendant to cure the error complained of. Nor did the defendant ever attempt to put in evidence any rule defining a "caboose" though counsel was invited to do so as above.

Again, later in the trial the subject of Rule 801 came up.

again. The following exchange, that will completely answer appellant, occurred:

"Mr. Shone: Just a minute, may it please the Court. We object to this as calling for the conclusion of the witness. The definition of an outfit car is not given in Rule 801, and the only manner of determining—a jury determines what an outfit car would be according to the custom and practice, or the knowledge of a person who has been in the general railroad business for a sufficient length of time, but he cannot give us a definition from this rule book, because it is not defined in the rule book.

"The Court: Let me see that rule, would you? Let me see that book. A. 801?

"Mr. Shone: 801.

"Mr. Booth: I will agree the rule doesn't include a definition of outfit cars, if it please Your Honor.

"The Court: This is in evidence, isn't it? 801?

"Mr. Shone: Yes, Your Honor.

"Mr. Booth: Yes, Your Honor.

"Mr. Shone: But it just speaks of outfit cars.

"The Court: All of Rule 801 is in evidence?

"Mr. Booth: That's right.

"The Court: (Reads Rule 801.) Well, ladies and gentlemen of the jury, I have had this in mind, and it has given me some bother. I don't see any other way. Let this witness answer the question. He is testifying as an expert of many years of experience on the railroad. Counsel don't agree. They have got an argument here, and I am going to allow this question. This matter will no doubt come up before you on the arguments to the jury. We may give you an instruction along this line. I am not sure yet. Objection overruled.  *  *  *

"Mr. Shone: We object to that as an invasion of the province of the jury. It's up to the jury to decide the ultimate question of whether that was a safe or unsafe place

for the plaintiff to work and whether or not it was a violation of this particular rule to place that car ahead of the freight cars.

"Argument By Counsel.

"The Court: Well, we had this question up before, and I ruled right along during this whole trial that in these cases the railroad men are testifying as experts. All of them who testified here have long experience. You had how many years, sir? A. Sixteen.

"The Court: Most of them had sixteen, some more. So, ladies and gentlemen, I am going to let this party testify, give you his opinion, the same as the others. After all, this is all going to be a question for the jury to determine. You will give his testimony, as the others, whatever weight you think best in your judgment as jurors.  *  *  *

"The Court: Just a minute, on that question that arose a minute ago, that is covered by an instruction which I will give you, ladies and gentlemen, with the consent of all parties: 'You are instructed that Rule 801 of the company rules was solely admitted in evidence in this case so that you can consider from a preponderance of all the evidence whether or not a violation of said rule was or was not negligence.' Now that is the instruction. All parties agree. That is why I am allowing these witnesses to give their opinions as to whether or not this rule was violated, and it's a question for the jury to determine. Very well, you may go ahead.  *  *  *

"The Court: Well, we are right back to the same old question again, and I have ruled pretty consistently, as I recall it, all through this case. From the testimony of the plaintiff Callihan that was offered by himself and his witnesses, that same question, as I recall, whether or not it was negligence to place this car where it was placed, next to the engine, the car in which the plaintiff Callihan was riding, and that rule all the way through, is a question for

the jury. Now here is another instruction which is given by the agreement of the parties: 'You are instructed that testimony introduced in this trial of the ordinary and usual custom and practice, if any, where a caboose containing workmen should be placed while the freight train in question was in transit, was admitted merely for the purpose of allowing you to determine whether or not it was negligence to be placed therein, and whether or not defendant used ordinary care in furnishing Callihan, the plaintiff, a reasonably safe place to do his work.' Now, that in connection with the other instruction I just read to you, which will be given to you later on, contains so far as I know the law in this case. Now, what is the point of your objection?

"Mr. Booth: The point of my objection is purely this, if it please Your Honor. We haven't talked about the safety, location of the caboose, and so forth, and that has all been admitted. We now have injected into this case the proposition of whether or not he would consider it safe to place a passenger coach carrying fare-paying passengers ahead of freight cars, which is an entirely different proposition, going into an entirely different realm of law, and raising the possibility of other matters that are purely side issues as to this case.

"The Court: Well, I overruled their objection a moment ago along the same line, and you understand, ladies and gentlemen of the jury, under the laws of this state the Court cannot comment or make any statement regarding the facts of the case. All the Court can do is state the law, and the Judge has to be very, very careful not to make any statement which may indicate any opinion the Court has as to what the facts are. You will be given an instruction along that line. Now, I overruled their objection a minute ago along the same line, and I am going to overrule his objection because it is a question for you to determine, and I am just going to read that instruction again, so I don't

make any mistake: 'You are instructed that Rule 801 of the company rules was solely admitted in evidence in this case so that you can consider from a preponderance of all of the evidence whether or not a violation of said rule was or was not negligence.', and that is given in connection with the other instruction: 'You are instructed that the testimony introduced in this trial of the ordinary or usual custom and practice, if any, where a caboose containing workmen should be placed while the freight train in question was in transit, was admitted merely for the purpose of allowing you to determine whether or not the defendant used ordinary care in furnishing Callihan, the plaintiff, a reasonably safe place to do his work.' Now you see both sides are fighting over this proposition, and I think this last objection should be overruled. Let the witness answer, just the same as I allowed him to answer over the objection of the plaintiff just a few minutes ago. I have forgotten what that was, but along the same line. Objection overruled, and you may answer. In other words, it is wholly a matter for you jurors to determine. * * *

"The Court: Well, just what application it has to this case we will leave to the jury. I think to strike this out would be error. The objection is overruled. We are right back to the same old question again. There is one statement I want to make clear. We have been on this all morning, one way or another. The instruction 32-A which we are going to give you I will read again: 'You are instructed that Rule 801 of the company rules was solely admitted in evidence in this case so that you can consider from a preponderance of all of the evidence whether or not a violation of said rule was or was not negligence.' Now, I want to make it clear the Court is not ruling that there was any violation of that rule. That is a matter for you to determine. All right, that's all. You may continue."

We have laboriously partially quoted the exchanges on this

matter and believe it plain the court made it clear to the jury that he was not commenting on the evidence and that they were left with the ultimate questions of whether or not a caboose could be an outfit car, whether Rule 801 was applicable, whether it was violated, and whether there was negligence. No error was committed.

The next specification of error was No. V to the effect that admission into evidence of mortality tables, over objection, was error. In this connection appellant contends there was no proof of permanent impairment of earning capacity. We have examined the medical testimony and find that there was substantial evidence submitted, although contradictory. There is no merit to this specification. See McNair v. Berger, 92 Mont. 441, 15 P.2d 834; Colusa Parrot Mining & Smelting Co. v. Monahan, 9 Cir., 1908, 162 F. 276; Vicksburg & Meridian R. Co. v. Putnam, 118 U.S. 545, 7 S.Ct. 1, 30 L.Ed. 257.

We have examined the remainder of appellant's specifications of error going to instructions and to the amount of the verdict. It would unduly lengthen this opinion to discuss each in detail, but we observe that taking the instructions as a whole, the issues were fairly and fully submitted to the jury. And, where the verdict of the jury lies within the limits of evidence of damages, we cannot say that the verdict is so excessive as to be based upon passion and prejudice rather than upon the evidence. See McCutcheon v. Larsen, 134 Mont. 511, 518, 333 P.2d 1013.

Finding no reversible error, we affirm the judgment.

MR. CHIEF JUSTICE HARRISON and MR. JUSTICE ADAIR concur. MR. JUSTICE ANGSTMAN being absent took no part in the hearing or determination of this appeal.