**UNITED STATES of America, Plaintiff,**

v.

**Roderick S. PIPES and Lasalle N. Waldrip, Defendants.**

No. 4:CR95–3031.

United States District Court, D. Nebraska.

Nov. 9, 1995.

David R. Stickman, Federal Public Defender's Office, Omaha, NE, John Stevens Berry, John Berry, Lincoln, NE, for Roderick S. Pipes.

Robert R. Nigh, Jr., Federal Public Defender's Office, Lincoln, NE, for LaSalle N. Waldrip.

Michael G. Heavican, Assistant United States Attorney, Omaha, NE, Richard E. Rothrock, Lancaster County Attorney's Office, Lincoln, NE, for U.S.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This matter is before the court on the Magistrate Judge's Report and Recommendation (filing 48) and the objections to the Recommendation (filing 49), filed as allowed by 28 U.S.C. § 636(b)(1)(C) and NELR 72.4.

I have conducted, pursuant to 28 U.S.C. § 636(b)(1) and NELR 72.4, a de novo review of the portions of the Report and Recommendation to which objections have been made. Inasmuch as Judge Piester has fully, carefully, and correctly found the facts and applied the law, I need only state that the Recommendation (filing 48) should be adopted, the defendants' objections to the Recommendation (filing 49) should be denied, and the defendants' motions to suppress (filings 26, 29) should be denied.

IT IS ORDERED:

1. the Magistrate Judge's Recommendation (filing 48) is adopted;

2. the defendants' objections to the Recommendation (filing 49) are denied; and

3. the defendants' motions to suppress (filings 26, 29) are denied.

## REPORT AND RECOMMENDATION

PIESTER, United States Magistrate Judge.

Pending before the court are defendants' motions to suppress. (Filings 26, 29.) For the reasons discussed more fully below I shall recommend the motions be denied.

On April 20, 1995 a grand jury indicted defendants on one count of possession with intent to distribute more than 50 grams of crack cocaine in violation of 21 U.S.C.

§ 841(a)(1) and 18 U.S.C. § 2. Defendants have filed motions to suppress a search of a 1994 Nissan automobile in which they were riding April 6, 1995. On July 24, August 1, and August 18, 1995, the court held a hearing on the motions.

### FACTS

On April 5, 1995 defendants were traveling northeast on Interstate 15 in Utah in a gray 1994 Nissan automobile. The Nissan was traveling with and behind a maroon 1980 Cadillac. Utah Highway Patrol Trooper Larry W. Orton pulled the Cadillac over for expired plates. In response to Orton's questioning, the driver of the Cadillac gave Orton two false names, a false date of birth, a false address and a false name for the adult male passenger in the Cadillac. The driver was also unable to produce a vehicle registration or bill of sale. Although the Nissan initially drove past the Cadillac and Orton's car, it then pulled off to the shoulder and reversed back to the area of the Cadillac stop. Defendant Pipes exited the vehicle and began walking back to Orton and the Cadillac; Orton instructed Pipes to return to the Nissan.

Before the Nissan had returned to the area, Orton had asked the male passenger of the Cadillac if he and the driver were traveling with anyone. The passenger replied that they were traveling with no one. When the Nissan returned, however, the passenger identified the driver of the Nissan as being his cousin. The Cadillac was searched and half of a marijuana "joint" was found in the ash tray, as well as a small quantity of marijuana and rolling papers behind the front seat. However, Orton only cited the driver of the Cadillac for expired plates and no license. Utah Highway Patrol Officer David Excel arrived at the scene and assisted Orton by investigating the Nissan. Excel checked identifications and the rental agreement for the automobile and performed a cursory weapons search, which yielded nothing. Both the Cadillac and the Nissan were allowed to continue on their trip.

Orton, however, suspected that there were more drugs being transported than the small amount found in the Cadillac. Orton was initially concerned by all of the false and misleading answers given him by the Cadillac driver and adult male passenger, as well as the absence of any vehicle paperwork and identification. Additionally, after subsequent investigation Orton learned from law enforcement authorities in Oklahoma that the male passenger of the Cadillac was connected to the "Main Street Mafia," an Oklahoma gang, that he made regular trips to California (weekly or biweekly) and was involved with a local body shop believed to be a front for narcotics dealing. Orton was also familiar with the practice of "throw down drugs," i.e. intentionally placing in prominent view a small quantity of drugs on the assumption that law enforcement will find it and believe it is the extent of drugs being transported. Despite his suspicions, Orton did not contact Nebraska law enforcement about the vehicles.

Nebraska State Patrol Jeffrey Ward was about to begin his 6:00 p.m. to 4:00 a.m. shift April 5, 1995 when he was instructed to call dispatch concerning a teletype. Ward drove to the truck scale stop at Greenwood where he picked up the teletype, which read:

CAUTION/KNOWN GANG ASSOCIATIONS

INVESTIGATE TRANSPORTATION CONTROLLED SUBSTANCE CEDAR CITY UT APR 5

OCCUPANT(S) DRIVING

NR1 WHITE/MAROON 80 CADILLAC DEVILLE 2 DOOR BEARING EXPIRED OK YOA198

NR2 WHITE/GREEN NISSAN STANZA CALIFORNIA NUMERALS UNKNOWN

OBSERVED CEDAR CITY UT 0900 MDT APR 5 ENROUTE OMAHA NB RT 80

MAKE OWN CASE CONTACT ORIGINATING AGENCY IMMEDIATELY

SIGNED NEB STATE PATROL OMAHA

FOR N–303 SGT LLOYD PETERS
PH 4023313333 FAX 4025952205
17:48 04–04–1990 MACKEY

(Plaintiff's Exhibit 2.)

Based on the teletype, Ward decided that he would look for the vehicles, following them to the Platte River if necessary in an effort to observe a moving violation sufficient to justify a stop. Using a truck mileage computer program at the Greenwood scales, Ward calculated that the vehicles would arrive in his area (I–80 from the Lincoln interchanges east towards Omaha) around 2:00 a.m. Ward was uncertain, however, whether he had factored in a time change from Utah.

At about 3:00 a.m. Ward was traveling westbound on I–80 near mile marker 395 (near the 48th Street exit) when he spotted two vehicles approaching him traveling eastward that "appeared to be speeding." Ward testified that he had been trained in visual speed estimation, which required an accuracy of within three miles per hour in a variety of settings (day, night, stationary, mobile, etc.) Ward estimated the vehicles to be traveling at 70 miles per hour. The posted speed limit for that portion of I–80 is 55 miles per hour.

Ward activated his "B" radar system and clocked the first vehicle—the maroon Cadillac previously stopped in Utah—at 69 miles per hour. Although the following Nissan was not clocked at that time, Ward testified that the Nissan was following the Cadillac at a constant speed.

Ward further observed that the Nissan was following "way too close."[1] Ward ex-plained that Nebraska State Patrol officers are trained to use the "two second rule" as a guideline for following another vehicle. That is, the driver of a following vehicle should be able to count two seconds between the rear bumper of the vehicle being followed and the front bumper of his vehicle. Although Ward acknowledged that the "two second rule" is not codified under Nebraska law, he testified that it was followed by the Nebraska State Patrol, and that under the circumstances the Nissan's following distance ("several" car lengths) was "dangerous."

After the vehicles passed Ward, Ward turned around in the median and began to pursue them. Ward was able to close the distance in approximately ¾ of a mile. Ward testified that at this point he knew that the Cadillac would be stopped for speeding and the Nissan for following too close. Ward therefore called dispatch for assistance. Ward then approached the Nissan and performed a VASCAR speed calculation on it, which yielded a speed of 67 miles per hour.[2] Ward also noted that his own speedometer (which is routinely calibrated) indicated a speed of 67–70 miles per hour while he was following the Nissan during the VASCAR calculation. The vehicles were still traveling in a 55 miles per hour zone.

As noted above, Ward had previously radioed dispatch for assistance. Dispatch told Ward that no other NSP officer was available, so Ward requested that dispatch locate

1. Following too close is a violation of *Neb.Rev. Stat.* § 60–6,140, which provides in relevant part:

   (1) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, and such driver shall have due regard for the speed of such vehicles and the traffic upon and the condition of the roadway.

   . . . .

   *Neb.Rev.Stat.* § 60–6,140 (Reissue 1992). Ward testified that he had issued "numerous" citations for following too close, none of which resulted in an accident.

2. VASCAR is a computer which calculates speed based on time and distance measurements. Operated much like the "two second rule," VASCAR's "time" switch is depressed when the target vehicle's rear bumper crosses a fixed point on the roadway; the "distance" switch is activated as the cruiser's front bumper crosses that point. After a sufficient distance, a second fixed point on the roadway is selected. When the target vehicle's rear bumper crosses that point the "time" switch is again depressed (inputting a value); as the cruiser's front bumper crosses that second point the "distance" switch is again depressed (inputting a second value). Based on the two input values the VASCAR calculates the target vehicle's speed. The greater the distance between the two fixed points, the greater the accuracy of the speed calculation. Ward testified that there was about a .7 mile distance between his two readings. Ward further testified that the VASCAR is regularly calibrated and checked against the "B" radar and the vehicle speedometer. Ward explained that the accuracy of the VASCAR is also dependent upon the accuracy of the officer in determining and applying the two fixed points. Ward did not recall what two fixed points he used in calculating the Nissan's speed.

assistance from the Lancaster County Sheriff. Ward continued to follow the vehicles until he received a response from dispatch at approximately mile marker 403 that assistance was on its way. At about mile marker 408–9 Ward saw two Lancaster County Sheriff's deputies approaching behind him. Ward did not know who the officers were, but was able to communicate with the officers through a special radio frequency "patch" set up by dispatch.[3] Ward told the deputies that he would stop the Cadillac and asked them to stop the Nissan for speeding.[4] The Nissan was not speeding at the time Ward told the deputies to stop it.

Ward pulled in behind the Cadillac and pulled it over. The Nissan and the two deputies drove by. The deputies and the Nissan crested a hill, and Ward was unable to see the actual stop. Ward was not involved in any search of the Nissan. Ward asked the driver of the Cadillac to step out from the vehicle. While performing a frisk search, Ward discovered a small plastic baggie of marijuana tucked in her pants.

The Nissan was pulled over by Lancaster County Sheriff Deputy James Baird, Jr. Baird was finishing an early breakfast at approximately 3:00 a.m. April 6, 1995 when he received a dispatching call from the 911 Center. The call dispatched Baird and two other deputies to the area of Highway 77 and Interstate 80. Although the call initially informed Baird that assistance was needed on a suspected Driving While Intoxicated violation, Baird eventually learned it was for two speeding vehicles also suspected of carrying narcotics. The special radio "patch" allowed Baird and the two Lancaster County deputies to communicate with Ward. Ward told Baird that he needed assistance pulling over two vehicles for speeding, and that Ward suspected narcotics being present.[5]

Baird caught up with Ward (who was then following the two vehicles traveling east-ward) at about mile marker 408. Although Baird did not observe either of the vehicles speeding, he did testify that the Nissan was following the Cadillac at a distance of only two car lengths (at 65 miles per hour in a 65 miles per hour zone.) Ward told Baird that he had observed the vehicles speeding and directed Baird to pull over the Nissan, and that Ward would pull over the Cadillac. Ward pulled in between the vehicles and pulled over the Cadillac as described above.

As Ward was pulling over the Cadillac Baird activated his overheard lights and siren and pulled behind the Nissan. Rather than pulling over, the driver and passenger began shrugging their shoulders at Baird, which Baird interpreted as a disingenuous attempt to show confusion as to why they were being asked to pull over. As the vehicles continued eastward, at about the 134th Street exit, the Nissan passenger (Defendant Waldrip) began hanging out the window of the Nissan, throwing out four bags of what Baird observed to be "something white." The Nissan continued on for approximately ½ mile before finally pulling over to the side of the Interstate. Baird testified that once he activated his lights and siren he followed the Nissan for approximately two minutes (two miles at 60–65 miles per hour) before the Nissan finally yielded.

In light of the Nissan's failure to yield, Defendant Waldrip's throwing the bags of white substance out the window and Ward's suspicion of narcotics activity, Baird decided to employ a "high risk" or "felony" traffic stop rather than an ordinary traffic stop. Once the vehicles stopped, Baird exited his vehicle, drew his weapon upon the Nissan (using his driver's side door as protection) and commanded the occupants out of the Nissan with their hands up. The defendants complied and were eventually led back to the waiting cruisers of the other Lancaster County deputies. Baird also saw two sets of

---

3. Ordinarily, the Lancaster County Sheriff and the Nebraska State Patrol operate on two different, incompatible radio frequencies.

4. Ward testified that he decided to stop the Cadillac (rather than the Nissan) because he believed it was the vehicle more likely to be transporting drugs and also because it would be easier for his

more compact vehicle (rather than one of the deputies') to squeeze in behind the Cadillac (in front of the Nissan) and pull it over.

5. Baird testified that he did not remember reading the teletype (Plaintiff's Exhibit 2) prior to making the stop.

"small hands" go up, those of two young boys under ten years old, who were asked to walk ·back to Baird's cruiser.

Baird walked up to the Nissan and observed in plain view a baggie of white powder on the console of the car. A Polaroid photograph of the baggie was taken before the car was disturbed. (Plaintiff's Exhibit 3.) The vehicle was then searched without a warrant, although Baird testified that a warrant was later obtained and arrived at the scene. During that search a suspected rock of crack cocaine was found on the passenger's side floorboard approximately 3–4 inches under the passenger seat. A canine search was later performed on luggage in the trunk, but no narcotics were found. That canine search was videotaped. No consent as to any of the searches was provided.

Lancaster County Sheriff Deputy Phillip D. Lang testified that he was one of the two deputies dispatched with Deputy Baird to assist in the Nissan stop. The dispatcher told Lang that a Nebraska State Patrol Trooper needed assistance in a traffic stop for speeding and that there existed a national broadcast that the two vehicles involved were suspected of narcotics activity. Lang testified that he recalled reading the teletype of this national broadcast (Plaintiff's Exhibit 2) prior to beginning his shift that day. Although Lang did not arrive at the scene until both Baird's cruiser and the Nissan had come to a complete stop, Lang testified that while monitoring his police radio he heard Baird say that the passenger of the Nissan had thrown something [6] out of the window at approximately mile marker 411.

## DISCUSSION

■ Despite the excessive length of the hearing and the volume of testimony and evidence presented, the dispositive issue is a narrow one requiring recognition of only a few key facts. It is clear that Trooper Ward had probable cause to stop the Nissan for speeding,[7] if not for following too close.[8] *See, e.g., United States v. Barahona,* 990 F.2d 412, 416 (8th Cir.1993). Trooper Ward's communication to Deputy Baird effectively provided Baird probable cause to stop the Nissan for those suspected violations. *See United States v. Horne,* 4 F.3d 579, 585 (8th Cir.1993) (probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication), *reh. and suggestion for reh. en banc denied* (Nov. 16, 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1121, 127 L.Ed.2d 430 (1994).

■ Once the Nissan was stopped, Baird was entitled to ask any questions reasonably related to the stop, including asking Defendant Pipes (the driver) for license and

6. Lang's report states Baird said only that "an object" had been thrown out of the window. Lang testified that he did not recall whether Baird had said what the object was. A subsequent radio broadcast stated that officers were looking for three bags of white powder at the roadside around mile marker 411.

7. Although a great deal of time was spent examining the operation, reliability and calibration of "B" radar, Trooper Ward's speedometer and the VASCAR speed calculation, no serious questions were raised as to the reliability of the VASCAR calculation that the Nissan was traveling 67 miles per hour in a 55 miles per hour zone. The accuracy of that calculation was also confirmed by Ward's (frequently-calibrated) speedometer reading (67–70 miles per hour) while following the Nissan for purposes of the VASCAR calculation, as well as Ward's earlier visual observation of the Nissan following the Cadillac (clocked at 69 miles per hour on the B-radar) with a constant distance between them.

8. While following too close, *see* note 3 *supra,* is certainly a matter of due care depending on the facts and circumstances then existing, defendants have pointed to no authority suggesting that a following distance of 2–3 car lengths at 69 miles per hour at night is clearly not "following too close" such that Trooper Ward was not justified in stopping the Nissan on that basis. *Cf. Farris v. Clark,* 158 Mont. 33, 487 P.2d 1307 (Mont. 1971) (20–25 feet at 60–65 miles per hour "clearly" negligent in following too close).

Although Ward was accompanied by a student intern, Paul Jacobson, who opined that the vehicles were "not exceptionally close," the intern's opinions were less than definite and he conceded that he was not paying "extremely close attention" to what was occurring. Moreover, as the intern was not a trained officer, his opinion on the issue of whether the Nissan was following too close is not entitled to the same weight as the trooper's opinion.

# 695

registration, requesting him to sit in the patrol car, and asking him about his destination and purpose. *United States v. Ramos,* 42 F.3d 1160, 1163 (8th Cir.1994); *see United States v. Bloomfield,* 40 F.3d 910, 915–16 (8th Cir.1994). If those permissible questions "raise inconsistent answers, or if the licenses and registration do not check out, a trooper's suspicions may be raised so as to enable him to expand the scope of the stop and ask additional, more intrusive, questions." *Ramos,* 42 F.3d at 1163. Where, however, "no answers are inconsistent and no objective circumstances supply the trooper with additional suspicion, the trooper should not expand the scope of the stop." *Id.* Thus, if Baird developed a reasonable, articulable suspicion that the Nissan was carrying contraband during a permissible traffic stop, justification existed "for a greater intrusion unrelated to the traffic offense." *United States v. Cummins,* 920 F.2d 498, 502 (8th Cir.1990), *cert. denied,* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991).

■ Here, even before being able to stop the Nissan to ask Defendant Pipes permissible questions reasonably related to speeding or following too close, Baird was provided abundant reasonable, articulable suspicion that the Nissan was carrying contraband, most notably the failure to yield to Baird's flashing lights and siren for two miles and Defendant Waldrip's throwing several baggies of a "white substance" out the passenger window. Moreover, once Baird approached the vehicle, an additional baggie of suspected crack cocaine was in plain view. There was probable cause justifying a search of the Nissan for narcotics.

■ Defendants argue that the traffic stop of the Nissan was pretextual. The Eighth Circuit has repeatedly stated that a traffic stop may not be pretextual. *See, e.g., United States v. Gonzalo Pereira–Munoz,* 59 F.3d 788, 790–91 (8th Cir.1995); *United States v. Eldridge,* 984 F.2d 943, 947–48 (8th Cir.1993). The source of the pretext doctrine appears to be the dicta of *United States v. Lefkowitz,* 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932), in which the Court asserted, without discussion, that "[a]n arrest may not be used as a pretext to search for evidence." *See United States v. Trigg,* 878 F.2d 1037, 1039 (7th Cir.1989). The Supreme Court has never recognized the doctrine directly, however, instead arguably reaffirming its existence but never discussing its contours or elements. *See id.*[9]

Accordingly, while most courts and commentators appear to recognize the existence of the pretext doctrine, there is disagreement as to its application. The circuits appear to be split between two approaches, a "legal justification" approach and a "reasonable officer" approach. Under the former "legal justification" approach, a stop is pretextual only if the officer had no legal justification for the stop; the officer's underlying pretextual motivation is irrelevant. This approach appears to be the majority position, and is the approach followed in this circuit. *See United States v. Cummins,* 920 F.2d 498, 501 (8th Cir.1990), *cert. denied,* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991); *see also United States v. Causey,* 834 F.2d 1179, 1184 (5th Cir.1987) (en banc); *United States v. Trigg,* 878 F.2d 1037, 1041 (7th Cir.1989), *cert. denied,* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991); *United States v. Hassan El,* 5 F.3d 726, 730 (4th Cir.1993); *United States v. Mitchell,* 951 F.2d 1291,

---

9. It is apparent the Court is not anxious to confront the issue. *See United States v. Cummins,* 920 F.2d 498 (8th Cir.1990), *cert. denied,* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991) (White, J., dissenting and recognizing Circuit split); *United States v. Enriquez–Nevarez,* 931 F.2d 890 (5th Cir.), *cert. denied sub nom. Cummins v. United States,* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991); *United States v. Trigg,* 878 F.2d 1037 (7th Cir.1989), *cert. denied sub nom., Cummins v. United States,* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991); *see also United States v. Robinson,* 414 U.S. 218, 221 n. 1, 94 S.Ct. 467, 470 n. 1, 38

L.Ed.2d 427 (1973) (finding that defendant was "lawfully arrested" despite the argument that the arrest for traffic violation was pretextual); *United States v. Villamonte–Marquez,* 462 U.S. 579, 588, 103 S.Ct. 2573, 2579–80, 77 L.Ed.2d 22 (1983) (rejecting pretext argument where evidence of illegal activity obtained from the search of a vessel where the initial reason for boarding the vessel was to inspect its documentation as authorized by statute, but suggesting that had the officers stopped an automobile on the highway rather than a vessel at sea the search would have violated the Fourth Amendment due to the absence of reasonable suspicion).

1295 (D.C.Cir.1991); *United States v. Hawkins*, 811 F.2d 210, 213 (3d Cir.1987), *cert. denied*, 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987); *United States v. Pringle*, 751 F.2d 419 (1st Cir.1984).

Under the competing "reasonable officer" approach, a stop is pretextual if a reasonable officer under the circumstances would not have made the stop absent the pretextual motive. *See United States v. Guzman*, 864 F.2d 1512, 1517 (10th Cir.1988); *United States v. Smith*, 799 F.2d 704, 709 (11th Cir.1986); *United States v. Gutierrez–Mederos*, 965 F.2d 800 (9th Cir.1992); *cf. United States v. Ferguson*, 989 F.2d 202 (6th Cir. 1993) (*see* addendum); *United States v. Dunson*, 940 F.2d 989 (6th Cir.1991), *cert. denied*, 503 U.S. 941, 112 S.Ct. 1488, 117 L.Ed.2d 629 (1992); *cf. also United States v. Rusher*, 966 F.2d 868 (4th Cir.1992), *cert. denied*, 506 U.S. 926, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992) (refusing to officially adopt either approach as the result would be the same under both tests, but finding the lower court's use of the approach not clearly erroneous.)

■ While the "legal justification" approach has attracted some arguably persuasive criticism as insufficiently safeguarding the individual's right to be free of unreasonable government intrusion from overzealous law enforcement techniques,[10] there is no question that it is the governing approach in this circuit. Accordingly, the only question is whether "the officer is legally authorized to stop the driver." *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir.1994). "[A]ny additional 'underlying intent or motivation' does not invalidate the stop." *Id.* Thus, Trooper Ward's candid testimony that he was looking for a traffic violation as an excuse to stop defendants' vehicles is irrelevant. The only issue is whether Ward was legally justified in stopping (or more precisely directing the stop of) the Nissan. As the Eighth Circuit has explained:

[Defendant] argues that the patrolmen intended to stop the Cadillac, regardless of whether or not they had probable cause, because of the tip they received, which, he says, did not by itself establish probable cause to stop the vehicle. The subjective intent of the patrolmen is of no consequence here, however. They did, in fact, have probable cause to stop [the Cadillac] as soon as they clocked it exceeding the speed limit. *It does not matter if their true intent was to stop the car to see if it was carrying drugs. Further, it is immaterial that the patrolmen had to pursue the car in order to catch [the driver] in violation of the law and that the officers ordinarily may not have stopped a car exceeding the speed limit by five to ten miles per hour.* Once [the driver] committed the traffic violation, there was probable cause to stop the car.

*United States v. Stapleton*, 10 F.3d 582, 583–84 (8th Cir.1993) (emphasis added) (citing *Cummins*, 920 F.2d at 500–01.)

Here, as explained above, Trooper Ward had legal justification to stop the Nissan for speeding, if not for following too close. After communicating that justification to Deputy Baird, Baird was likewise justified in making the traffic stop. *See Horne, supra.* The stop of the Nissan was not pretextual.

Furthermore, the additional factors noted above, including the several baggies of "white substance" which were thrown out the passenger window of the Nissan and the baggie of suspected crack cocaine in plain view in the Nissan, provided further probable cause justifying the subsequent search.

For the reasons discussed above, I shall recommend that defendants' motions to suppress be denied.[11]

**IT THEREFORE HEREBY IS REC-OMMENDED** to the Honorable Richard G. Kopf, United States District Judge, pursuant

---

**10.** *See generally* Matthew S. Cridor, *Criminal Procedure—Searches And Seizures—Police Officers Must Meet "Reasonable Officer" Standard To Withstand Pretext Claim. State v. Haskell, 645 A.2d 619 (Me.1994)*, 36 S.Tex.L.Rev. 629 (1995) (arguing that "reasonable officer" approach strikes the appropriate balance between an individual's right to be free of unreasonable govern-ment intrusion and the state's interest in effective law enforcement).

**11.** This is not to say, however, that the actions of the officers were in all respects upstanding. Defendants did present evidence that the Utah officers' suspicions may have been aroused by racial animus, and also questions about Officer Ward's suspiciously malfunctioning microphone and su-

to 28 U.S.C. § 636(b)(1)(B), that Defendants' motions to suppress (filings 26, 29) be denied in all respects.

The parties are notified that unless objection is made within ten days after being served with a copy of this recommendation, they may be held to have waived any right they may have to appeal the court's order adopting this recommendation.

**FURTHER, IT HEREBY IS ORDERED** that trial of this matter is set for 9:00 a.m. on December 11, 1995, or as soon thereafter as the case may be called, with jury selection at the commencement of trial. Trial is scheduled for four trial days.

Dated October 13, 1995.

perhuman vision in identifying license plates of oncoming vehicles on a divided highway at night. Those bits of evidence are indeed disturbing, and raise extremely serious challenges to the officers' credibility. In this case, however, in light of the remaining undisputed evidence which amply demonstrates probable cause, those challenges do not overcome the prosecution's proof justifying this stop and this search.